WILLIAM D. BAKER

v.

FRANCES M. BAKER et al.

202   595
e110a   86
202   595
113a  ⁸560

*Opinion filed February 18, 1903—Rehearing denied June 9, 1903.*

1. WILLS—*what does not prove want of testamentary capacity.* Proof that the testator was enfeebled, to some extent, with the usual infirmities of old age, both mentally and physically, does not establish a want of testamentary capacity.

2. SAME—*value of non-expert testimony as to testamentary capacity.* The value of the opinions of non-expert witnesses as to the testa-tor's testamentary capacity depends upon the means of knowledge of the witnesses, the facts upon which their opinions are based and their capacity to correctly interpret such facts.

3. EVIDENCE—*when letters from testator are competent on will contest.* Letters from the testator tending to show a rational, business-like purpose to make a will substantially like the one in contest are competent, as tending to show the mental condition of the testa-tor and to disprove the charges of undue influence.

4. SAME—*when letters remote in point of time are competent.* Letters from a testator, although too remote in point of time, if standing alone, to be competent upon the question of the testator's mental condition, are nevertheless admissible if their subject matter is repeated in other letters which are competent in point of time.

5. SAME—*certified transcript of testimony of subscribing witnesses at probate is admissible.* Under section 7 of the act on wills, providing that on a will contest in chancery the "certificate of oath" of the subscribing witnesses at the probate shall be admissible, a certi-fied transcript of their testimony at the probate is admissible on contest, notwithstanding the witnesses themselves have already testified to the same effect.

6. SAME—*what questions not subject of non-expert testimony.* Non-ex-pert witnesses for contestant who stated they did not regard the testator as capable of transacting ordinary business, cannot be allowed to answer whether or not the testator had sufficient mind and memory to understand the will, to carry in his mind the nature and extent of his property or to understandingly execute a will.

7. SAME—*widow incompetent if her interest lies with side offering her.* On will contest, the widow of the testator, whether made a party complainant or defendant, is incompetent if her apparent interest in the pending litigation, at the time she is offered as a witness, lies with the side offering her testimony.

8. INSTRUCTIONS—*instructions should be considered as a series.* In-structions should be considered as a series in determining whether the jury has been correctly advised.

9. BURDEN OF PROOF—*burden of proof in will contest.* The burden of proof in a will contest is upon the proponents to make a *prima facie* case by introducing the certificate of oath of the subscribing witnesses at the time of probate, but when this is done it devolves upon the contestant to prove the allegations of his bill as to the testator's incompetency by a preponderance of the evidence, since the legal presumption of sanity is added to the weight of the *prima facie* case which must be overcome.

10. APPEALS AND ERRORS—*when allowance of a fee of guardian ad litem will be sustained.* Under section 6 of the Chancery act, authorizing the court to appoint a guardian *ad litem* and tax a fee for his services as costs, the court may, in the exercise of its legal discretion, allow a reasonable fee, it being presumed the court had knowledge of such services and the reasonable value thereof, and the allowance will stand on appeal, in the absence of evidence showing an abuse of discretion.

APPEAL from the Circuit Court of Cook county; the Hon. R. W. CLIFFORD, Judge, presiding.

WILLIAM D. BARGE, and EDGAR B. TOLMAN, for appellant.

JESSE A. BALDWIN, and HENRY R. BALDWIN, for appellees.

Mr. JUSTICE WILKIN delivered the opinion of the court:

Appellant prosecutes this appeal from a decree of the circuit court of Cook county sustaining the last will and testament of James E. Baker, deceased, on his bill to contest the same. The grounds upon which it was sought to set aside the will were want of testamentary capacity in the testator, and that he was unduly influenced in making the same by Caroline B. Kuehn, James E. Baker, Edward B. Lathrop and Frederick M. Atwood, named therein as legatees, trustees and executors, the allegation being that they "falsely represented to the testator that the complainant was incapable of managing his affairs, and was an habitual drunkard and spendthrift, and not a proper person to be entrusted with the management of the property; that those defendants knew these representations were false, yet they made them to-

induce the testator to execute the will." All beneficiaries under the will, among whom are the widow and heirs-at-law, were made parties defendant, two of the legatees being minors. The death of the testator, probate of the will and issuing of letters testamentary were duly averred. The widow, Frances M., made default, and a decree was rendered against her *pro confesso*. Guardians *ad litem* were appointed for each of the infant defendants and they filed several answers in the usual form, setting up the infancy of their wards, etc. The other defendants answered the bill, denying the allegations as to want of testamentary capacity and undue influence but admitting all the other facts alleged. Upon the bill and answers an issue at law was made up whether the writing produced by the bill was the will of the testator, James E. Baker, or not, which was tried by jury, the evidence being heard in open court, except the testimony of one of proponents' witnesses, by the jury. The verdict was in favor of the validity of the will, and the court, after overruling complainant's motion for a new trial, entered its decree sustaining the same, and ordering the complainant to pay the costs of the suit, including a fee of $50 to John E. Singworth as guardian *ad litem* of the infant defendant Madeline T. Atwood, and a fee of $150 to Daniel M. Healey as guardian *ad litem* of the infant defendant Katherine Baker. The complainant duly excepted, and was allowed this appeal.

The errors assigned and urged as grounds of reversal are: First, the verdict is contrary to a preponderance of the evidence; second, the court erred in permitting improper evidence to go to the jury on behalf of the proponents; third, the court erred in excluding proper evidence offered by the contestant; fourth, the court gave improper instructions for the proponents; fifth, the court refused proper instructions for the contestant; sixth, the court erred in refusing to permit the widow of the testator to testify (which is included in the third); seventh,

the court erred in allowing Healey a fee of $150 for services as guardian *ad litem,* and taxing that fee against appellant.

The following is a copy of the will and attestation:

"I, James E. Baker, of the city of Chicago, county of Cook and State of Illinois, being of sound mind and memory, and considering the uncertainties of life, do therefore make, publish and declare this to be my last will and testament.

"*First*—I give, devise and bequeath all my property of every kind, real, personal and mixed, to such of my executors and trustees hereinafter named as may accept and serve, and to the survivors of them and successors, as herein provided, in trust for the following purposes:

"To pay all my just debts and funeral expenses as soon after my decease as conveniently may be.

"To hold and manage, to the best of their ability, my estate during the life of my dear wife, Frances M. Baker, and during said period of her natural life to distribute the net income thereof as follows:

"(*a*) To pay to my beloved wife, Frances M. Baker, one-third ($\frac{1}{3}$) of all the net income of said estate.

"(*b*) To pay to my daughter, Caroline B. Kuehn, two-ninths ($\frac{2}{9}$) of all the net income of said estate.

"(*c*) To pay to my son James E. Baker two-ninths ($\frac{2}{9}$) of all the net income of said estate.

"(*d*) To pay for the support and education of my grand-daughter, Katherine Baker, and the support (in such manner as will best protect his welfare) of my son William D. Baker, and the survivor of them, two-ninths ($\frac{2}{9}$) of all the net income of said estate.

"(*e*) The following bequests to be paid during the executorship, from the revenue of my entire estate, as soon after my death as possible, without inconvenience to my heirs, viz.: To Edward B. Lathrop, $5000; to Frederick M. Atwood, $2000; to Mrs. Frederick M. Atwood, $1000; to Edith C. Atwood, $1000; to Madeline T. Atwood, $1000.

Any payment made on account of the above bequests during my life, for which receipts are filed herewith, shall diminish said bequests by the respective amounts of such receipts.

"*Second*—I desire that my estate shall not be divided during the life of my dear wife, Frances M. Baker. At her death it shall be divided into three (3) equal parts:

"(*a*) The first to go to my son James E. Baker, if he be then living, and if he shall be deceased at that time, then to his heirs-at-law then living.

"(*b*) The second to go to my daughter, Caroline B. Kuehn, if she be then living, and if she be not then living the property shall be held by my executors and trustees and its net income paid over to her son during his life, and at his decease it shall go to and belong to his children, if he leave any, and if he die without leaving children, then to his maternal heirs.

"(*c*) The third portion shall be controlled and managed by said executors and trustees, and so much of its income as is deemed necessary shall be by them applied to the suitable support and education of my granddaughter, Katherine Baker, the remainder of said income to be paid over, from time to time, to my son William D. Baker, and in the event of the death of either, the income provided for him or her, respectively, shall be applied for the benefit of the survivor. The provisions hereby made as to payment of income are to continue during the life of said Katherine and the said William D. Baker, and the survivor of them, and at the decease of the said survivor the property shall go and belong to the children of said Katherine Baker and the said William D. Baker, share and share alike. Should there be no surviving child or children of either said Katherine Baker or the said William D. Baker, then the property shall go and belong to the paternal heirs of such survivor.

"*Third*—I hereby constitute and appoint executors hereof and trustees hereunder (and I desire that no bonds

shall be required of them or any of them) the following persons, or such of them as may serve: My daughter, Caroline B. Kuehn; my son James E. Baker; my friend Jesse A. Baldwin; my friend Frederick M. Atwood. And I especially request that such as may serve in either or both capacities will secure, from time to time, the judgment, upon matters pertaining to the trust, of such as may not serve, and in the event that they should all decline to serve or should all resign, I appoint the Northern Trust Company of Chicago, with the same powers and duties.

"I particularly give to my executors and trustees, and to each of them as may serve, from time to time, full power and authority to do any act or any thing, and make any conveyance or conveyances by them deemed necessary to effectuate the purpose hereof, hereby expressly providing that the acts of a majority of such as serve shall be deemed the acts of all, and that neither shall be liable for the acts of the other, but only for the exercise of good faith.

"In witness whereof I have hereunto set my hand and affixed my seal this 27th day of September, A. D. 1899.

JAMES E. BAKER. [SEAL.]

"The foregoing instrument, consisting of about three and one-half pages, was, at its date, signed, published and declared by the testator, James E. Baker, to be his last will and testament in the presence of us, who at his request, in his presence and in the presence of each other, have subscribed our names hereto as witnesses, believing the said James E. Baker to be of sound mind and memory and of about the age of eighty-three years.

J. R. RICHARDSON, M. D.,<br>Residing at 1671 West Congress street.<br>CHARLES T. BOAL,<br>Residing at 1732 Michigan avenue, office 222 Reaper Block.<br>HENRY E. PATRICK,<br>Residing at 414 Wisconsin avenue, Oak Park, Illinois.

Filed February 14, 1900.—JAMES REDDICK, *Clerk.*"

The three attesting witnesses testified as follows: Henry E. Patrick, that he had been in business in Chicago fourteen years; that he identified his signature to the will, and that he signed it in the private office of Jesse A. Baldwin, September 27, 1899; that the testator, Dr. J. R. Richardson, Charles T. Boal and himself, and Jesse A. Baldwin, were present at the time of signing; that he was there from fifteen minutes to a half hour; that he saw Mr. Baker sign the paper, and that Mr. Baker saw witness sign it. He explains the circumstances of being there for from fifteen to thirty minutes, by Mr. Baldwin being called from the private office on other business and those present waiting for his return. He says: "I had a conversation with the old gentleman, and so did the others. He said he had formerly been in business at Madison, Wisconsin. He asked me about my family, and I informed him I had a son in the University of Wisconsin. I signed my name at the request of James E. Baker. He wished me to sign as a witness to his will. Physically, he was in very good condition for a man of his years. It was stated at the time he was about eighty-three years old. I saw him walk. In my judgment his mind was then as clear as a bell." On cross-examination he stated: "I was not acquainted with James E. Baker before that time, and had not seen him before or had any conversation with him. All this was within a period of not more than thirty minutes. Jesse A. Baldwin invited me to go there. I have known him fifteen or twenty years. He had been my attorney, but was not at that time. Baldwin might have taken part in the conversation before he left the office. While Baldwin was out, Boal, Richardson, Mr. Baker and I were in conversation. My conversation was more specific than upon general subjects. He seemed to take a great interest in young men, and the conversation was in regard to my son, whom he did not know. When Baldwin returned, the subject matter of the conversation was that we were to witness

the signature of Mr. Baker to this instrument, which was all ready for signature."

John R. Richardson testified that he had lived in Chicago ten or eleven years, and was employed with F. M. Atwood; that he was a physician by profession but did not practice medicine, but managed the men's clothing department for Mr. Atwood; that he had known James E. Baker for ten years,—the time he had been employed in the store; that he identified his signature, and that he signed it at the request of Baker in the office of Jesse A. Baldwin, in the Reaper block, in the city of Chicago; that it was signed as the last will of Mr. Baker. He corroborates the preceding witness as to the length of time they were in the room, and says that he had met Mr. Baker and conversed with him many times. "I should think he was absolutely of sound mind at the time he signed the will. I visited him at his home on one occasion when he was ill from a fall. It was in the fall or winter. The weather was cold. He had fallen and injured his hip. I was there an hour, probably. I had known him a number of years before. I saw him at our place of business almost entirely. He was in there a great deal. Atwood was his tenant. I would meet him in conversation quite frequently. I saw him on one occasion after this will was executed. He was just preparing to take his trip to California. That was late in the fall of the year preceding his death. I was in conversation with him probably twenty minutes at that time. His mind seemed to be as usual—excellent. In my judgment he was then capable of transacting ordinary business." It appeared from his cross-examination that he did not claim to be a practicing physician, and it was stated by counsel for proponents that he was not offered as an expert.

Charles T. Boal, the other attesting witness, testified that he had lived in Chicago fifty-four years; that he was in the real estate business, and had been in the whole-

sale merchandising and manufacturing; that he met Mr. Baker at the time of signing the will. His testimony is substantially the same as that of the other two witnesses as to the circumstances of signing and witnessing the will. "I should think I was in the room from twenty-five to thirty minutes that morning. * * * The initials 'J. E. B.' were put on the margin of the first, second and third pages by Mr. Baker at the time he signed the will and in my presence. I talked with him a little while that morning when Mr. Baldwin was out, but don't remember anything he said, except he had been in Chicago a long while and knew my wife's father. He was of sound mind at that time, and, I believe, capable of transacting ordinary business." He states on cross-examination that he only met Mr. Baker the one time; that Mr. Baldwin sent for him and he was then introduced to Mr. Baker.

Dr. Norton R. Yeager, a graduate of the University of Pennsylvania, who had practiced in Chicago twelve years and lived about two blocks from the residence of the testator, having known him about eight years, during which time he was his family physician and knew the family well and intimately, testified as to his mental condition, as follows: "I saw the old gentleman in the summer before he left for California, and think he was competent then to transact ordinary business. I saw him professionally on three occasions; socially, quite a number of times." On cross-examination he stated that on two occasions when he visited Mr. Baker he was not competent to transact business because of attacks of heart failure. The first one, in the summer of 1899, lasted fifteen or twenty minutes. He was ill a day afterwards, as a result. The second was about three weeks after. "Simply a case of heart failure—a momentary loss of consciousness. It was not an organic heart trouble. The cause was simply that he was in declining years—senile changes. These changes which affect the heart action produce a change in the organism of the heart itself.

They are limy deposits in the soft tissues of the heart and brain, and this affects the heart by reason of its losing its elasticity and becoming more rigid, and it affects the brain in the same way. Where we find senile attacks of heart failure we expect to find a general deterioration of the system,—a general deposit of the same limy and calcareous deposits of salts in the brain and tissues generally. This attack was in the summer, and Mr. Baker left in the fall and went to California. The first attack was in July or August, the second August or September. Mr. Baker was an old man. I didn't see any appreciable change in his physical condition during the eight years I knew him. His physical condition and his capacity were that of a man of his years. I don't know that he carried on any business while I knew him."

There is no evidence whatever tending to show that at or about the time of the execution of the will Mr. Baker was suffering from any attack of heart failure as described by the physician. As many as fifteen or sixteen of his neighbors and associates, with some of whom he had business transactions from time to time, of more or less importance, testified that in their opinion he was of sound mind and capable of transacting the ordinary business affairs of life at and prior to the date of the execution of his will.

Proponents also offered in evidence a prior will, which was first made November 19 and re-executed November 22, 1898, the latter being an exact copy of the former, except the first was typewritten and the last written with a pen. Two of the attesting witnesses to each of these copies were Daniel Schroeder and H. C. Franklin, and the last copy was also witnessed by Henry P. Williams. The first two testified that the reason for the re-execution, as stated by Mr. Baker, was, that he thought there might be a legal question as to the validity of a typewritten will. The copy of that instrument is as follows:

"I, James E. Baker, of the city of Chicago, county of Cook and State of Illinois, do make this my last will and testament:

"*First*—I direct that all my just debts and funeral expenses be paid.

"*Second*—I devise and bequeath one-third of all the net income of my entire estate to my beloved wife, Frances M. Baker, during her lifetime, the balance of said income to be divided into three equal portions, as follows: The first portion to go to my daughter, Caroline B. Kuehn; the second portion to go to my son James E. Baker;. the third portion to my trustees hereinafter named, it being my desire, as already explained to these trustees, to safeguard its use as follows: First, my trustees are directed to use as much of this last named portion as is, in their judgment, proper to support and educate my grand-daughter, Katherine Baker, and the remainder is to be used to support my son William D. Baker. My trustees are directed to pay out all moneys in such manner as shall, in their judgment, best protect the welfare of my son William D. Baker, and my granddaughter, Katherine Baker.

"*Third*—My estate shall not be divided during the lifetime of my dear wife, Frances M. Baker, but after her death it shall be divided and deeded in three equal parts, share and share alike, as follows: First, to my son James E. Baker; second, to my daughter, Caroline B. Kuehn; third, to my trustees hereinafter named, for the benefit of my son William D. Baker, and my grand-daughter, Katherine Baker. This third portion, when deeded to my trustees, shall be controlled by these trustees as long as they or their successors shall think such protection is needed. I desire that a majority of said trustees shall at all times have power to appoint their successors, and so perpetuate this trusteeship indefinitely. Said trustees will first pay for suitable support and education of my grand-daughter, Katherine Baker, and the balance of the

net income shall then be paid over to my son William D. Baker.

"*Fourth*—If my daughter, Caroline B. Kuehn, should not be alive when my estate is divided, then her portion shall be deeded to her estate, and shall be controlled by my trustee or trustees whom they shall appoint, and such trustees shall continue to control this portion as long as they think such protection is needed by her heir or heirs.

"*Fifth*—I appoint as my trustees, and desire that no bonds be required of them, the following persons: My daughter, Caroline B. Kuehn; my son James E. Baker; my friend Edward B. Lathrop; my friend Frederick M. Atwood.

"*Sixth*—I make the following bequests, to be paid as soon after my death as is possible without inconvenience to my heirs, from the revenue of my entire estate: To Edward B. Lathrop, $5000; to Frederick M. Atwood, $2000; to Mrs. Frederick M. Atwood, $1000; to Edith C. Atwood, $1000; to Madeline T. Atwood, $1000. If above bequests are paid during my life, receipts will be filed herewith.

Chicago, November 22, 1898.          James E. Baker.

"This instrument was on the day and date thereof signed, published and declared by the said testator, James E. Baker, to be his last will and testament, in the presence of us, who at his request have subscribed our names thereto as witnesses, in his presence and in the presence of each other.

Daniel Schroeder,
H. C. Franklin,
Henry P. Williams."

Counsel for the contestant do not question the testamentary capacity of James E. Baker at the time this will was executed. On the contrary, they affirm its validity, and say: "On November 19, 1898, the old gentleman executed a will written upon the typewriter, in which he makes a disposition of his property, with trustees to take charge of William's share, the provisions

of which are reasonable and satisfactory,—a will that is
not in dispute, and which, if it can now be introduced
in probate in lieu of the will in controversy, will be
accepted as a settlement of this litigation." They then
proceed to point out what they conceive to be a substan-
tial difference in the bequest to the complainant made
in that will and the one in question. It is not denied,
however, that both wills placed the gift to William D.
in trust, and it must be conceded that there is no such
material difference between the two wills in that regard
as to in any way indicate a change in the mental condi-
tion of the testator. We are at a loss to perceive how
it can, on the evidence in this record, be admitted that
James E. Baker was of sound mind and memory on the
19th and 22d of November, 1898, and at the same time
be seriously insisted that he was of unsound mind and
memory when the will in dispute was executed. That
the evidence produced upon this trial clearly establishes
the validity of the former we entertain no doubt, but to
our minds the same evidence is equally conclusive as to
the validity of the one executed less than a year later.
Daniel Schroeder, one of the attesting witnesses to the
will of 1898, says: "At the time I signed this paper,
dated November 22, 1898, Mr. Baker's mind was perfectly
sound. I saw him during the summer and fall of 1899,
shortly before he went to California, and his mind was
always clear and sound. He was perfectly capable of
transacting ordinary business during 1899. At the time
he signed the will dated November 19 his mind was per-
fectly sound and clear." Another witness to that will,
H. C. Franklin, testified that he knew James E. Baker
eight or ten years, and saw him on an average twice a
month in the last two or three years of his life. And
he further stated: "I frequently had conversations with
him. That is my signature to the paper purporting to
be his will, dated November 22, 1898. I saw Mr. Baker
sign his name there. Mr. Schroeder, Mr. Baker and I

were present at that time. In my judgment his mind was perfectly good at that time and he was then capable of transacting ordinary business. If my memory serves me correctly, I saw him the first week of September, 1899. I just spoke a few words to him at that time, and didn't see any change in him. I should say his capacity for transacting ordinary business was sound at that time." He also identified his signature to the copy of November 19, and says: "There was no difference from the condition of Mr. Baker's mind at that and any other occasion, that I observed. His mind was sound."

Of the seven witnesses introduced by the contestant, most of them detailed merely casual conversations with the deceased, and seem to have formed their opinions rather from his enfeebled physical condition than from any close scrutiny of his mental capacity. None of them testified as experts. Their opinions as to the soundness of his mind were competent, but under the rule often announced by this court, at least some of those opinions were of very little probative force. Speaking of such testimony in the case of *Craig* v. *Southard*, 148 Ill. 37, we used this language (p. 47): "The weight or effect of such opinions will necessarily depend upon the means of knowledge of the witness, and the facts upon which they are based, possible of delineation, and the capacity of the witness to correctly interpret what he has observed. It is everywhere, therefore, held that the facts upon which the opinion is predicated may be gone into either to sustain and give force to the opinion or to discredit it, and the opinion will be entitled to much, little or no weight, depending upon the facts upon which it is predicated and the intelligence and character of the witness,"—citing authorities. So weighed and tested, it is very doubtful whether all the testimony introduced by the contestant was sufficient to overcome the *prima facie* case made by the defendants by the introduction of the will and testimony of the subscribing witnesses. Not

only was the number of witnesses testifying to the mental soundness of the deceased more than double that of those testifying to the contrary, but several of the former base their opinions on important business transactions and conversations relating to the business affairs of life, giving greater weight to their opinions than to those of the witnesses for the contestant.

The son of the deceased, Dr. James E. Baker, resided in the State of New York, and the proponents introduced letters written by his father to him, dated May 13, 1884, May 19, 1884, November 13, 1890, December 1, 1892, February 1, 1893, February 1, 1894, and December 1, 1898, parts of which were read to the jury. These letters each referred to the habits and conduct of the contestant as being dissipated, etc., and in some of them are expressed the deep sorrow and great anxiety of the father on account of such conduct and habits. In each of these letters he also declared his purpose at his death to so dispose of his property that the part of it which should go to his son William D. should be in trust, or so limited that he could not waste or squander it. The last of these letters was, as will be seen by its date, written after the execution of the will of November 22, 1898, and in it he says: "I have had a bad cough for a month and my right lung is weak, but I have got grit and don't give up. All my papers are with Lathrop, and I have told him that the terms as stated in my will must be carried out to the letter. My will gives you, as I stated to you, very nearly twice as much as it does Will, and Callie and you share alike. This I explained to Callie, and she is pleased, of course. I know Will and your mother will howl if I should die before she does, but I have done according to my judgment and my wishes."

Miss Catherine Jacobs, the witness who testified by deposition, says that she was with the family in California from January until May, 1897, and that Mr. Baker talked with her about his property and what he intended.
202—39

to do with it upon his death. She further says: "He said
he would never leave any money or property in Will's
hands after his death, but he would provide for Will's
daughter. He said he would provide in such a way that
Will could not get at the property. He said Mrs. Baker
would have a fine income during her life and Will would
have all the money he wanted during her life, and after
her death he would have money enough, which would be
paid out to him by trustees as they would see fit, and they
were to provide for Catherine. Part of these statements
he made just before he went to California. I was in his
family in 1899—the fall and winter of that year. He went
to California late in 1899. He talked with me shortly be-
fore his departure to California, in 1899, about the terms
of his will, and said he had made a will. He said he had
not left any property to Will, only in this way: Mrs.
Baker would have plenty of money during her life, and
Will would have money enough to spend and do as he
pleased with after her death; he would have money
enough, which would be paid him by the trustees as they
see fit. He said Will would make trouble. He said he
showed the will to Mrs. Baker." She then testified to the
old gentleman making the arrangements for the trip to
California, and described his condition, saying, "He was
of sound and capable business mind." He also made state-
ments to other witnesses clearly indicating his purpose
to leave his property in substantially the manner that
he did leave it, so far as the complainant is concerned.
In other words, the evidence proves beyond cavil or doubt
a fixed and positive determination on the part of James
E. Baker to dispose of his estate as he has done by this
will,—and that at times and on occasions when there
could be, and is, no question as to the soundness of his
mind. The most that could possibly be said from the
proofs against the validity of that will would be, that
when it was executed he was enfeebled, to some extent,
with the usual infirmities of old age, both mentally and

physically; but by all the authorities that alone would not be sufficient to prove a want of testamentary capac- ity. *Entwistle* v. *Meikle*, 180 Ill. 9, and authorities cited.

The allegation of undue influence is substantially un- supported by any proof. Neither of the defendants who are charged with having made false and fraudulent rep- resentations as to the complainant's habits and ability to take care of property is shown to have been present when the will was executed, or to have had any commu- nication with testator on that subject. Nor is it claimed by counsel in their argument that either Mrs. Kuehn, Dr. Baker or Edward B. Lathrop did or said anything, at any time, calculated to influence the deceased in the disposition of his property. The claim that Frederick M. Atwood had some peculiar influence over him is based upon the fact that he received for his services $5000 in a transaction between Mr. Baker and certain tenants; but it is not shown, nor is it claimed, as we understand the argument of counsel, that he at any time made any representations to Mr. Baker about the habits or conduct of the complainant. It is also to be remarked on that branch of the case, that if representations of his disso- lute and dissipated habits had been made they would have been far from false and fraudulent. We regard the testimony in this record on the issues of fact as so clearly preponderating in favor of the validity of the will in dis- pute, that it would have been the duty of the chancellor to set aside a verdict to the contrary if one had been so returned by the jury.

The first ruling of the court below in the progress of the trial questioned by counsel is that it admitted im- proper evidence on behalf of the proponents over the objection of the complainant, and it is insisted that the letters written by the deceased to his son, Dr. James E. Baker, were incompetent. As we have already said, these letters, and each of them, tended to show a rational, business-like purpose to make a will in substantially the

manner in which the one in question was made. They were therefore competent, both for the purpose of disproving the allegation of undue influence and as tending to show the mental condition of the testator. (*Hill* v. *Bahrns,* 158 Ill. 314; *Kaenders* v. *Montague,* 180 id. 300; *Wombacher* v. *Barthelme,* 194 id. 425.) The position that some of the letters are too remote in time from the making of the will to be competent would doubtless be tenable if the earlier ones stood alone, but being repeated in substance,—that is, the subject matter of the earlier letters being repeated in those of later dates,—makes them all competent as a chain of evidence. No fixed rule can be laid down as to when such evidence is too remote to be competent.

It is next contended that it was error to admit testimony of complainant's drunkenness after the death of the testator. A witness, John S. Clark, introduced by the defendants, testified that he had known William D. Baker since 1894 or 1895, and had seen him intoxicated a number of times,—could not say how many. One or more of those occasions, he stated, was in the year 1900, which was after the will was made. He could not say positively, because prior to the year 1900 he did not see much of him. He saw him occasionally, but not much, prior to that time. On cross-examination he was asked if he was to be understood as testifying to any special time when he was drunk before the beginning of the year 1900, and answered "No." He was then asked, "You intended to confine your testimony, then, to two occasions after 1900?" and answered, "As far as my recollection serves me, it is since 1900 that I have seen most of Mr. Baker." But on re-direct examination he again stated: "I had seen him before that—not more than two of those drunken sprees;" and on re-cross: "I have seen him under the influence of liquor before January, 1900; could not tell the date." The evidence, when given, was not objected to, but counsel for the complainant afterwards moved to

strike out all of it referring to the period subsequent to the date of the making of the will, and the motion was denied. Habitual drunkenness is a continuing condition, —that is, the habit of being intoxicated. Proof of the condition soon after the will was executed would tend to prove the previous habit,—at least that he had not reformed at the time the will was made, so as to have then regained favor with his father. Conceding, however, that the testimony was immaterial and should have been excluded for that reason, it cannot be seriously contended that the judgment below should be reversed for that error.

The last objection to the admission of evidence is, that it was error to admit the certified transcript of the testimony of the attesting witnesses given in the probate court. At the beginning of the trial the proponents offered a certified transcript of that testimony taken at the time the will was probated, which was objected to generally, and the objection overruled. It was not, however, then introduced, but after the same witnesses had testified before the jury it was again offered, and the objection renewed and overruled. That testimony is known in the record as proponents' "Exhibit 2," and was entitled, "Testimony taken in the probate court of Cook county in the matter of the proof of the last will and testament of James E. Baker." Then follow the words: "Henry Patrick, being first duly sworn, testified in open court, as follows." After the formal questions and answers as to the witness' name, residence, age and occupation, he stated that his name was signed to the will as a witness, and then testified as follows:

Q. "At whose request did you sign your name to this instrument?

A. "At James E. Baker's, the testator.

Q. "And for what purpose did you sign your name to this instrument?

A. "Attesting the will.

Q. "Did you see James E. Baker sign his name to this instrument?

A. "I did.

Q. "Did James E. Baker see you sign your name to this instrument?

A. "He did.

Q. "Who were present at the time James E. Baker signed his name to this instrument?

A. "The other two witnesses, Charles T. Boal, Jesse A. Baldwin, the maker of the will and myself, and John R. Richardson.

Q. "Who were present at the time you signed your name to this instrument?

A. "The same parties.

Q. "That you have just named and mentioned?

A. "Yes.

Q. "About how old was James E. Baker at the time he signed his name to this instrument?

A. "He was an old gentleman between seventy and eighty years.

Q. "What date was it when the witnesses and James E. Baker signed their names to this will?

A. "The 27th of September, 1899,—the date the instrument bears.

Q. "What was the condition of the mind and memory of James E. Baker at the time he signed his name to this instrument?

A. "I conversed freely with James E. Baker, and my best judgment is that he was of clear, sound mind when he made this instrument and signed the will.

Q. "Do you believe that at the time James E. Baker signed his name to this instrument he was of sound and disposing mind and memory?

A. "I do.

Q. "Was there any fraud, undue influence or duress used to secure the signature of James E. Baker to this instrument?

A. "None whatever, to my knowledge.

Q. "Did James E. Baker contract any marriage after signing his name to this instrument?

A. "Not to my knowledge."

The testimony of John Robert Richardson, another attesting witness, was to the same effect, he also swearing that the mind of the testator at the time he signed his name to the instrument "was exceptionally good; that he was of sound and disposing mind and memory, and that there was no fraud, undue influence or duress used to secure his signature to the instrument."

Section 2 of chapter 148 of our statute entitled "Wills," (Hurd's Stat. 1899, p. 1746,) provides that "all wills, testaments and codicils * * * shall be reduced to writing and signed by the testator or testatrix, * * * and attested in the presence of the testator or testatrix by two or more credible witnesses, two of whom, declaring on oath or affirmation, before the county court of the proper county, that they were present and saw the testator or testatrix sign said will, testament or codicil, in their presence, or acknowledged the same to be his or her act and deed, and that they believed the testator or testatrix to be of sound mind and memory at the time of signing or acknowledging the same, shall be sufficient proof of the execution of said will, testament or codicil, to admit the same to record: *Provided*, that no proof of fraud, compulsion or other improper conduct be exhibited, which, in the opinion of said county court, shall be deemed sufficient to invalidate or destroy the same." Section 7 of the same chapter, which authorizes the contest of wills in chancery, contains the provision: "And in all such trials by jury as aforesaid the certificate of the oath of the witnesses at the time of the first probate shall be admitted as evidence and to have such weight as the jury shall think it may deserve."

The uniform holding of this court has been that the certificate of the oaths of the witnesses on a bill in chan-

cery to contest a will makes a *prima facie* case for the proponents. In *Pendlay* v. *Eaton*, 130 Ill. 69, we said (p. 71): "The defendant put in evidence the will and *the testimony of the subscribing witnesses given when the will was admitted to probate*, which was *prima facie* evidence of its validity,"—citing *Holloway* v. *Galloway*, 51 Ill. 159; *Carpenter* v. *Calvert*, 83 id. 62; *Wilbur* v. *Wilbur*, 129 id. 392. We are unable to see why this evidence was not competent when it was first offered, nor do we think the order in which it was introduced in any way affected its competency.

Counsel seem to think that a transcript of the testimony of the attesting witnesses is not what is meant by the statute in the use of the language, "the certificate of the oath of the witnesses at the time of the first probate," though that specific objection was not made when the testimony was offered. The language of the statute may be somewhat obscure, but we think it means simply the *ex parte* declaration, on oath, of the attesting witnesses required by section 2, *supra.* Whether that declaration is in the form of an affidavit or questions and answers is immaterial.

But it is said that to allow the transcript of the testimony of these witnesses given in the probate court is to give proponents the benefit of the testimony of such witnesses twice. That is, or may be, the result in every case, because of the express proviso to section 7, *supra.*

We think the court committed no error in permitting the testimony to go to the jury.

It is again insisted that the court erred in the exclusion of competent testimony offered by the contestant. Several of the witnesses introduced in his behalf, (none of whom, as we have said, testified as experts,) after stating that they did not regard the deceased as capable of transacting ordinary business, were asked the questions "whether or not the testator, at the time of making the alleged will, had sufficient mind and memory to understand the will in question;" "whether or not he was

able to carry in his mind and memory the nature and extent of his property," and "whether or not he was able to understandingly execute a will," which questions were objected to and the objections sustained. These questions simply called for the conclusions of the witnesses as to testamentary capacity. In other words, the attempt was to put the witnesses in the place of the jury, and allow them to determine the very issue which it was sworn to try. The evidence was clearly improper. *Schneider* v. *Manning*, 121 Ill. 376; *Pyle* v. *Pyle*, 158 id. 289.

Under this head should also be considered the contention that it was error to sustain an objection to the competency of the widow, Frances M. Baker. It has been held by this court in numerous cases, that upon a proceeding in chancery to contest the will of a husband the widow is incompetent if her interest lies with the side offering her testimony,—and this whether she be made a party complainant or defendant. (*Brace* v. *Black*, 125 Ill. 33; *Pyle* v. *Pyle*, 158 id. 289; *Bardell* v. *Brady*, 172 id. 420.) The widow in this case had elected to take under the will, and it is not denied that her interest was with the complainant, if, upon setting aside this' will, the estate would become intestate; but the attempt is to show that if this will should be annulled, the one made in November, 1898, would be entitled to be admitted to probate and become the last will and testament of the deceased, and that under that will the widow's interest would be substantially the same as under the one against which she was called to testify. We are unable to appreciate the force of this position. The witness was rendered incompetent because of her interest in the result of the litigation pending,—that is, her interest as it appeared at the time she was introduced. Certainly she could not be rendered competent by the possible happening of some event in the future. She is incompetent because, in theory of the law, she would be influenced to testify most strongly on the side of her interest. How

can it be said that her mind at the very time would be free from that bias because another will might be probated which would destroy the interest then appearing? Moreover, as we have said, if the will now in controversy is invalid, the one of November, 1898, is equally so.

The eleventh instruction given on behalf of proponents, which attempted to lay down the rule as to what evidence is sufficient to make a *prima facie* case for the proponents, is meaningless upon the evidence in the record, and should have been refused; but it could have done no more than confuse or mislead the jury, and any such possible effect was overcome by other instructions given on behalf of both the complainant and defendants.

Other instructions given at the instance of the defendants are objected to. The language in which some of these are couched may not be entirely accurate, but they are, in substance, in harmony with the law as announced in the decisions of this court. In determining whether the jury has been correctly instructed in a given case it is the duty of this court to consider the instructions as a series. We have carefully read each one of those given in this case. They were unnecessarily voluminous, many of them bearing unmistakable evidence that they were written by skillful counsel representing the contesting parties; but considering them together, we entertain no doubt that they were fair to the complainant and contained no reversible error.

Complaint is made of the refusal of two of the instructions asked by the complainant. In so far as they would, in any view of the case, have been proper, they were given in others at the request of the complainant.

The more earnest complaint is made of the refusal of the thirty-first instruction, which counsel construe to be, in effect, a direction to the jury that the burden of proof throughout the case was upon the proponents to prove the testamentary capacity of the testator. In the early case of *Holloway* v. *Galloway*, 51 Ill. 159, we said, speaking

of an instruction on the subject as to the burden of proof (p. 161): "It is true, as urged by counsel for plaintiffs in error, that persons seeking to establish a will must prove the testator was of disposing mind and memory at the time he made it,—and this cannot be shown merely by proof that he was so at some anterior period. But, nevertheless, this instruction can have worked the plaintiffs in error no prejudice. The defendants had put in evidence, as the statute authorizes, the testimony of the subscribing witnesses given when the will was admitted to probate, and this was *prima facie* evidence of its validity. This testimony raised a presumption of the competency of the testator, which would be valid until disproved by counter-testimony. It placed upon plaintiffs in error the burden of showing the incompetency of the testator by proof sufficient to overcome the *prima facie* case made for him, and this is all that was required by the foregoing instruction as a result of competency proven to have existed in 1845." It was not intended by what was said in *Slingloff* v. *Bruner*, 174 Ill. 561, to overrule prior cases or change the rule announced by them. We afterwards held in *Entwistle* v. *Meikle*, *supra*, (p. 26): "Objection is made to proponent's fourth instruction. It in effect tells the jury that the certificate of the oath of the subscribing witnesses to the will of James Entwistle, introduced in evidence in the case, makes *prima facie* proof of the validity of the will; that a party seeking to contest a will, after the making of such *prima facie* case, on the ground of unsound mind or insanity, takes upon himself the burden of proving such grounds relied upon, and such cause or causes must be proven by a preponderance of evidence, and the jury are to determine, from the whole evidence, whether or not the instrument offered and introduced in evidence was the will of James Entwistle. This instruction is sustained by the cases of *Craig* v. *Southard*, 162 Ill. 209, and *Egbers* v. *Egbers*, 177 id. 82, in which last case we said (p. 88):

'This court has repeatedly said that the law presumes every man to be sane until the contrary is proved, and the burden of proof rests upon the party alleging insanity. (*Argo* v. *Coffin*, 142 Ill. 368; *Guild* v. *Hull*, 127 id. 523; *Menkins* v. *Lightner*, 18 id. 282.) But it is incumbent on the proponents of the will to make out a *prima facie* case, in the first instance, by proper proof of the due execution of the will by the testator and of his mental capacity, as required by the statute. The burden of proof is then upon the contestants to prove the allegations of their bill, by a preponderance of all the evidence, that the testator was mentally incompetent. The law throws the weight of the legal presumption in favor of sanity into the scale in favor of the proponents, from which it necessarily results that upon the whole case the burden of proof rests upon the contestants to prove the insanity of the testator,'—citing *Craig* v. *Southard, supra; Same* v. *Same,* 148 Ill. 37; *Taylor* v. *Pegram,* 151 id. 106; *Wilbur* v. *Wilbur,* 129 id. 392; *Carpenter* v. *Calvert,* 83 id. 62." See, also, *Johnson* v. *Johnson,* 187 Ill. 86, where we again said (p. 99): "The proponents of the will must make out a *prima facie* case, in the first instance, in the manner already stated. The burden of proof is then upon the contestants to prove the allegations of their bill by a preponderance of the evidence. The law throws the weight of the legal presumption in favor of sanity into the scale in favor of the proponents,"—citing some of the foregoing decisions. To the same effect is *Huggins* v. *Drury,* 192 Ill. 528, and the case of *Thompson* v. *Bennett,* 194 id. 57. The instructions given at the instance of both parties were in conformity with these decisions, and in so far as the thirty-first announced a different doctrine it was erroneous.

The contention that the court below erred in allowing Daniel M. Healey a fee of $150 as guardian *ad litem* for the infant daughter of complainant, Katherine Baker, is upon the ground that the allowance is unreasonable.

We find no evidence in the record on that subject. The court found, by its decree, that the fee was reasonable, and ordered it paid as costs against the complainant. Section 6 of the act to regulate the practice in courts of chancery authorizes the court to appoint a guardian *ad litem* for any infant defendant in a cause in equity and compel the person so appointed to act. The section also provides that the person so appointed shall be allowed a reasonable sum for his charges as such guardian, to be fixed by the court and taxed in the bill of costs. (1 Starr & Cur. Stat. chap. 22, p. 562.) It is the duty of the court to see that he makes all proper defenses. (*Peak* v. *Pricer*, 21 Ill. 164.) He must act under the directions of the court. (*Stunz* v. *Stunz*, 131 Ill. 210.) It must therefore be presumed that the chancellor had knowledge of the services rendered by Healey and the reasonable value of such services. He could, in the exercise of his legal discretion, make the allowance, and in the absence of evidence tending to show an abuse of that discretion we cannot say the allowance was unreasonable.

The decree of the circuit court will be affirmed.

· *Decree affirmed.*