HIRAM HAYES et al. v. LOARN HAYES et al., Appellants.

Division One, March 29, 1912.

1. **WILL CONTEST: Action at Law: Practice: Undue Influence.** A suit to set aside a will for undue influence is an action at law, and where there was any material evidence tending to prove plaintiffs' allegation of undue influence, the case was one for the jury.

2. ————: **Undue Influence.** Undue influence means the substitution in a will, when executed, of the will and purpose of some person other than the testator. The allegation of undue influence as the sole ground of attack upon a will implies intellectual competency on the part of the testator except for the dominance over his mind and intentions in the disposal of his estate of a stronger will or different purposes from what he would have expressed if left to his own guidance.

3. ————: ————: **Partiality and Prejudice of Testator.** Proof of a father's partiality and prejudice as regards his children— such partiality and such prejudice, that is, as are not engendered by craft or fraud and which do not subdue his mind and free agency—is not sufficient to set aside his will made under the influence of those emotions. Nor would it alter the case that such emotions were unjustly harbored.

4. ————: ————: **Right of Alienation.** The absolute ownership of property implies the right of arbitrary disposition of it according to the loves, hates or caprices of the grantor. The only limitation of the power of the owner to alienate his property (aside from coercion, fraud, or lack of mentality) exists when the instrument of conveyance was made at a time when the volition of the grantor was so far destroyed that the instrument expressed, not his own intentions and wishes, but the different designs and objects of those who controlled his actions.

5. **PRECATORY TRUST: Terms.** In order to imply a trust from the use of precatory words, the terms employed for that purpose must be inserted in the will or other instrument of settlement, and used in an imperative sense as to a certain subject and a certain object or person.

6. **EVIDENCE: Remarks of Testator: Undue Influence.** The testator's remarks, made at various times not contemporaneous with the making of the will, that the reason he did not give anything to his other children was to keep down dissensions in his family, were evidentiary only of the testator's state of mind, not of the truth of the things stated; and such remarks cannot be taken as proof of undue influence.

7. **WILL CONTEST: Undue Influence: Material Evidence Reviewed.** *Held*, that there was in this case no evidence of undue influence exerted upon the mind of a testator when he made his will.

Appeal from Barry Circuit Court.—*Hon. F. C. Johnson*, Judge.

Reversed.

*W. P. Sullivan, G. Purd Hays* and *T. D. Steele*, for appellants; *James T. Neville* of counsel.

(1) An attack upon a will on the ground that it was procured by undue influence necessarily assumes the existence of a will otherwise valid and regularly

executed. Upon this issue therefore, the burden of proof is on the contestants. Jones v. Roberts, 37 Mo. App. 163; Carl v. Gabel, 120 Mo. 283; Morton v. Heidorn, 135 Mo. 608; Doherty v. Gilmore, 136 Mo. 414; Campbelle v. Carlisle, 162 Mo. 634; Schierbaum v. Schemme, 157 Mo. 1; King v. Gibson, 191 Mo. 307. (2) Mere undue influence is not sufficient; to invalidate the will such influence must be so exercised as to result in the will made, and will not do so then, if such influence was of a wife or child and was exercised in a fair and reasonable manner, without fraud or deception. Crowson v. Crowson, 172 Mo. 691; McFadin v. Catron, 138 Mo. 197; Jackson v. Hardin, 83 Mo. 175; Maddox v. Maddox, 114 Mo. 35; Jackson v. Hardin, 83 Mo. 175. (3) When proponents have made out their prima facie case, it then devolves on contestants to prove undue influence by substantial testimony, failing in which, the court should direct a verdict for defendants. Sehr v. Lindemann, 153 Mo. 276; Schierbaum v. Schemme, 157 Mo. 16. It was the duty of the trial court to give a peremptory instruction to the jury to find in favor of the will where a prima facie case was made by the proponents and there was no substantial evidence to sustain the contest. Jackson v. Hardin, 83 Mo. 175; Maddox v. Maddox, 114 Mo. 35; McFadin v. Catron, 138 Mo. 197; Riley v. Sherwood, 144 Mo. 354; Sehr v. Lindemann, 153 Mo. 276; Winn v. Grier, 217 Mo. 420; Fulton v. Freeland, 219 Mo. 494; Gibony v. Foster, 230 Mo. 106; Mackall v. Mackall, 135 U. S. 167; Martin v. Bowdern, 158 Mo. 379; Catholic University v. O'Brien, 181 Mo. 93; Schierbaum v. Schemme, 157 Mo. 22. (4) Statements made by the testator, both before and after the execution of the will are admissible as evidence of the testator's mental condition and the state of his affections, but such statements are not admissible as proof of undue influence,

nor of the truth of the facts narrated. Crowson v. Crowson, 172 Mo. 691; Techenbrock v. McLaughlin, 209 Mo. 533; Seibert v. Hatcher, 205 Mo. 83.

*J. J. Gideon, G. A. Watson, J. S. Davis* and

*James George* for respondents.

The court did not err in refusing the mandatory instructions at the close of the plaintiff's evidence and at the close of all the evidence. The question of undue influence was the only question submitted to the jury, the question of want of testamentary capacity having been eliminated at the commencement of the trial. There was abundant evidence to justify the court in submitting this question to the jury. The defendants did not stand upon their demurrer but joined the plaintiffs in submitting this question in their instructions. We understand the rule to be that the trial court cannot be convicted of error when, after demurrer to the evidence has been overruled, the defendant requests and obtains instructions submitting the issues to a jury which finds against him. This is certainly so where there is evidence to sustain the verdict. Crum v. Crum, 231 Mo. 636.

BOND, C.—This suit is to set aside, for undue influence, the will of W. R. Hayes, who died March 22, 1907, leaving a second wife, Adaline Hayes, seven children and one grandchild, the descendant of his eighth child; all of whom are parties plaintiff and defendant to this suit. The will in dispute was formally executed August 4, 1898, and purported to devise to the said widow and one child (Loarn Hayes) all the real and personal estate of the testator. The remaining six children and the grandchild are expressly named in the will and excluded from any share in the property therein devised. There was a mistrial in Christian county, and a change of venue to Barry

county, where, after a second mistrial, the cause was again tried at the September term, 1908, of the circuit court.

At the hearing, the evidence, in substance, was, to-wit: The first wife of William R. Hayes died August 4, 1876, after having given birth to eight children, the fruit of her marriage. A little more than a year thereafter he married Adaline Hayes, his widow and one of the defendants. No children were born of this union. Four of the children of the first marriage had married at the time of their father's second marriage: Hiram, Martha Anderson, Eliza Downing and Mrs. Jones. The other children, not then of age, lived with their father, and included Loarn, two years of age; Minerva, fourteen; John, sixteen, and Prior eighteen. As they became respectively of age, they moved away from their father's home, except Loarn who remained there and at another house on the farm during his father's life.

Hiram Hayes, then fifty-five years of age, testified, that no misunderstanding occurred between himself and his father. "My relations with him remained friendly to the time of his death." On cross-examination, he stated, as follows: "We had a little difficulty shortly after he married the second time. I don't remember how many years that I didn't visit him, might have been as many as ten or twelve. We spoke to each other during that time when we passed, but had no conversation, I never tried to talk to him. He invited me to visit them and I went. It might have been only three or four years afterward, I don't know. I remember this trouble was about buying that tombstone; he was asked to put up one, and didn't, and a part of us went ahead and put it up. This was after father had married a second time. Sister Martha had asked him to put it up, I believe. I never asked him. Mrs. Anderson, Mrs. Downing and myself bought this tomb-

stone. We put it up without saying to father what we were going to do. I knew father's disposition; knew his feelings were easily hurt. I didn't know whether it would hurt his feelings or not. I suppose it would. . . . I expected it would make him mad and hurt his feelings at the time we did it. That is the trouble that came up between me and father first. It was not but two or three years till father came to see me and invited me to visit him, and I went and visited him off and on from that on. I don't know how often. I plowed corn on his place once since that and the summer before he died him and stepmother came down and spent a day with me, one Sunday, and him and my cousin came down one Sunday. I never discussed the tombstone proposition with him. . . . When I married he gave me a team, chain harness, a year's provisions and a cow. I didn't have as much as father —he had land and I didn't. When I went back to visit him my stepmother was there. I never had any trouble with her. She always treated me nicely. She never told me not to come.''

He was at his father's house when he died, and had a talk with Loarn, who told him that ''Pap made his will and willed it all to me'' (Loarn). ''Pap said for me to divide with you and John.'' That he (Loarn) stated he did not know what was in the will until told by his father, and that he (Loarn) went to Billings, where the will was deposited, and examined it ''to see whether Roswell Jones's (the grandchild's) name was on it.'' That he further stated to witness: ''Hiram, Pap said for me to divide with you and John.''

Eliza Downing (nee Hayes) testified, that she and her husband moved away from her father's house when he married the second time; that she and a married sister prepared the dinner for him at his house on the wedding day, and received their stepmother;

that she did not visit her father thereafter for twenty-five years, but did go to see him when he had "gangrene in his foot." She stated also, that she never heard either her stepmother or her brother Loarn say anything to her father about his will, but she thought "he was influenced or he never would have willed his children out."

Martha Anderson testified, that the first estrangement between her father and his elder children grew out of the fact that the stepmother stopped the younger children (who remained at home) from coming to see her and the other married ones (who had moved away); that she thought he was influenced in the matter of making his will but she did not know how; that she did not visit her father's house after December 24, 1877, while he lived; that she should have done so if she had thought she would be welcome; "that about four years ago Loarn told her that father had made a will and had willed everything to him, and remarked, 'that he done just as he told him there with everything.'"

Minerva Carlin stated she stayed at her father's house after his second marriage until she was sixteen years of age, when she was taken away by one of her brothers, after she had been struck with a rolling pin by her stepmother for not getting breakfast early enough on a certain Sunday morning; that she tried to defend herself; that her father came in the room, and each of them told her own side; that her father told her to "hush;" that she went back in the kitchen "and finished up breakfast," and left about ten days thereafter and made her home with her sister Martha until she became twenty-five years of age, when she married; that her father never asked her to return; that her stepmother never spoke to her until after her marriage; that she saw her father at Loarn's house

in 1902 or 1903. He then asked her to visit him for two or three days; that Loarn wrote her about the affliction of her father; that she then wrote her father offering to come and see him, and received a reply from Loarn telling her not to come, that "he (her father) said he would like to see her, but he could not stand the abuse he would have to take if I would come," therefore Loarn advised her not to come.

On cross-examination she testified, to-wit: "Q. Did you ever hear your stepmother suggest to your father he should dispose of his property in any particular way? A. Not to him, but she told me she didn't intend to allow 'your Pap to give you children anything.' Q. Your Pap did just about as he pleased, didn't he? A. He did when he was by himself; when he was with her, I don't believe he did. Q. As a matter of fact you don't know of any influence exercised by either your stepmother or Loarn in making this? A. I know just what she said to me, 'I don't intend to allow your Pap to give you children a penny,' and the will says we didn't get it, that is all I know about it."

Prior L. Hayes worked on the farm until twenty-one years of age, and left after a fight with his father, whom he knocked down in the course of the difficulty. He took his sister Minerva away after the fight between her and her stepmother. He did not revisit his father for twenty-two years, but saw him three times during the last two years of his life.

John Hayes testified he left the home of his father when twenty years of age and about five years after the second marriage; that he and the younger children while at their father's house were forbidden to visit their married sisters, whose husbands were disliked by their father. He left after an altercation with his father, but visited him regularly and often up to his death. He then talked with Loarn who told him that

the property was all willed to him (Loarn), and that their father had requested him to divide. "Q. Just state what he said? A. He said that he was to divide with me and Hiram. Q. That is the substance of it? A. Yes, sir. Q. You could not give his exact language? A. No, sir, we had quite a talk about it. I expect we talked half an hour about it." That he had heard of a previous will made in 1883, whereunder the estate of his father was equally divided between him and Loarn, except the widow's dower and a bequest of five hundred dollars to two grandchildren.

Samuel Angus testified, that the testator told him that he had given everything to Loarn; "that he allowed to help John some, but did not for he desired to have 'a little peace,' and 'it kept up so much hell about it, that is the reason he said he fixed it that way.'" This talk was six or seven years before the trial.

Frank Smart stated, that the following conversation was had between him and the testator: "That was in 1893, we shocked across the west end of that square of wheat and got down to the southwest corner and stopped there, he said let's wait until the man comes with the water. It was a hot evening. While we was standing there he looked over the field and looked around, he said: 'It won't be long I will be here in the heat working, it won't be long until this all belongs to Loarn.' He says, 'I am going to will everything I've got to Loarn and Adaline.' I said, 'Aren't you going to will Hiram and the other children anything?' 'No,' he says, 'I am not going to will them a penny.' I said, 'What is your reason for this?' 'Well,' he said, 'Frank, 'y God, it is to keep war down in the family.'"

Lee Hodges testified as follows: "I was acquainted with William R. Hayes, worked for him. I

don't remember what month it was, it was in 1899, I believe November, I am not sure. He told me he had willed his stuff to Loarn; made a will with the understanding that he was to divide with John and Hiram. I was not working for him at this time. This occurred over in the field by a hay barn. Mr. Hayes was my uncle by marriage. His first wife was my mother's sister.''

Walter Davis testified as follows: ''I was well acquainted with William R. Hayes. I heard him several times make different statements about his property, in a will prior to this one here now. He made one will before this one; this will, I never heard him say anything in regard to it. He said he willed everything to Loarn and John in that will. That statement was made, I think, about 1883. Q. I will get you to state if you ever heard Adaline Hayes say anything about what she intended to do as to his property. A. I heard her in this first will—I heard him and her talking. I heard her claim if she could have her way the older ones could not have a dollar of it, something to that amount. He always told me he intended for John and Loarn to have what he had. I was working there.''

Defendants introduced a number of witnesses who stated that the testator told them what disposition he had made of his property, both under his first and second will; that he expressed a strong feeling against those of his children whom he had excluded from his will.

The attorney who prepared the will stated that the testator spoke to him on the street about making a will, and afterwards came to his office to have his will drafted or changed, when the following took place: ''And I took a tablet and made some notations as to what disposition he wanted to make of his property until we came to the disposition of the land of which

he was the owner. Uncle Dick asked me if it was necessary to describe the lands, that is, give the legal description. I told him it was not absolutely necessary, but it made a better chain of title by giving a description of the lands. He was sitting down, or sat down, and took a piece of paper and marked off the lands and was able to give me the description. I think it was of 160 acres, but he was unable to give me the description definitely of the remainder of his land. I suggested to him that it would be better, perhaps, if he was not in a hurry, to wait until he came again. He said he was in no particular hurry and would bring his deed with him, so, on the 4th day of August, 1898, he came into my office bringing with him his deeds, and asked me if I was ready to draft this instrument for him. I told him I was, and we went into my private office, he and I, and the will was drafted according to his suggestions and dictations.

"In discussing the manner in which he would dispose of his property, he made the remark that it is necessary to give all of them something, and asked me if that was correct. I told him it was not, that the only thing the law required was the mentioning of the name of his children, and he could do it by giving them something or not, as he chose to do. He asked me if I was sure of that. I told him I was. 'Well,' he says, ''y God, I don't want any of them to have a penny but Loarn.' Well, he also had some talk about the children, whether he should disinherit them. I don't remember distinctly about any of the girls being mentioned, except Mrs. Anderson, and that seemed to be more a dislike for Mrs. Anderson's husband than for herself. Q. Tom Anderson? A. Yes, sir. And he appeared to be very bitter against his son Prior at that time, and related the circumstance of a difficulty that Prior related here on the stand yesterday.

"The will was drafted in accordance with his wishes. I asked him who he wanted to attest it, he said he would go down and find some one. He went down on the street and was gone perhaps twenty minutes, I judge, something like that, and he returned with the witnesses, Pierce and Reinbold. I think they all came in the office about the same time, so I asked him if he was ready to sign it. He said, 'I want you to read that to these men, I want them to know that I know what is in it,' a little unusual, but I read it. I had read it to Mr. Hayes at least once before that, and I presume read each paragraph as I wrote it. I don't remember distinctly about that fact. I read it before the witnesses came up and after it had been completed, and, at his request, read it to the witnesses for them; each came in and signed it, and the will was duly executed, and he asked me if I would keep it. I told him I had no safe and that it was customary and usual to deposit those instruments in some safer place than I had, and he took the instrument in a sealed envelope with the fact stated thereon that it contained the last will and testament of Wm. R. Hayes, and perhaps the names of the witnesses and executor, I don't know about that. I sealed the envelope up and gave it to him, and he says: 'I will take it over to Jack,' meaning Mr. Howard, and he left the office.

"Now Mr. Sullivan, at the time the will was drafted and he came there after having got his deeds, did he have the will that he had formerly made with him? A. Yes, sir; he had the will there on that day, and he referred to that with reference to the drafting of this will in question. Q. If you remember, what was the difference in the provision of the first will and the last one? A. The first will, so far as Adaline Hayes was concerned, was the same as this one. He asked me also in this will, in drafting this will, about what she was entitled to. I told him, and he asked me if I didn't

give her that much property what would be the probable results, and I told him that she would renounce the will and take under the law, and he told me to look over this old will and see what she had been given there. My recollection is now that she was given a life estate in some more land in the first will than in the last will, by reason, I suppose, of the fact that lands had advanced, she got more acres maybe, something said along that line. He figured out there at the time what the lands executed to her were reasonably worth and this first will after taking care of the widow and leaving a legacy to the grandchildren, Jones children, of which there was two at that time, I mean at the time the first will was drafted. I am not sure that was $500 each or $500 to be divided between the two, $250 each. I remember that it made mention of $500, but whether to be divided equally or $500 each, I could not. say. Then the remainder of the estate was divided between the boys, John and Loarn. With that exception, the will—the first will and the last will, the will in controversy, were the same. No, the first will gave to each of the other children five dollars.

"Q. What did he say, about the time he made this last will, what did he say about what he intended or wanted to do or provide for his wife? A. He said he wanted his wife to have what the law allowed her, but not a damn cent more. Q. That was his remarks? A. Yes, sir. Q. Were you acquainted with his personal traits of character and will power and disposition towards people generally? A. Yes, sir, I was pretty familiar with his disposition. Q. Tell the jury all about Uncle Dick Hayes, his characteristics and disposition towards his family and people generally. A. Well, he was a man of a very determined and positive nature and a man who was strong in his affections and equally strong in his prejudices and feel-

ings. He was a man whom you didn't have to guess where he was on any proposition. He was free to express himself as to what he thought was right or wrong; and if he disliked you, he didn't hesitate to tell you; and if he liked you, he was your friend; he was a good friend, in fact, he was like every boy he raised—there is the same disposition in all of them.

"Mr. Watson: 'We ask that be stricken out.'

"The court: 'Yes, let that be stricken out.' "

Cross-examination by Mr. Davis: "Q. Do you remember the number of acres he devised in this last will? A. Two hundred and thirty."

At the conclusion of the trial, the jury rendered a verdict that the will propounded was not the will of W. R. Hayes.

The defendants, Loarn Hayes and Adaline Hayes, filed motions for new trial, which being overruled they duly appealed to this court.

## OPINION.

I. The first complaint is the declination of the court to give a peremptory instruction requested by defendants at the close of the entire testimony. This is a legal action. If, therefore, there was any material evidence tending to prove the exertion of undue influence over the mind of the testator when he made his will, the case was one for the jury.

The sum of the law on this subject is, that by undue influence is meant the substitution in the terms of the instrument at the time it was executed of the will and purpose of another person or persons for that of the testator. The allegation of undue influence as the sole ground of attack upon a will implies intellectual competency on the part of the testator other than the dominance over his mind and intentions in the disposal of his estate of a stronger will or different purposes from what he would have expressed

if left to his own guidance or free agency. [Remsen on Wills, p. 382, sec. 8; Gibony v. Foster, 230 Mo. l. c. 136; Morton v. Heidorn, 135 Mo. 608; Carl v. Gabel, 120 Mo. 283.]

Proof of partiality and prejudice of a father as regards his children which are not engendered by craft or fraud and which do not subdue his mind and free agency, is not sufficient to set aside a will of his property made under the influence of these emotions. Nor would it alter the case that such feelings are unjustly harbored. [Dausman v. Rankin, 189 Mo. l. c. 703; Winn v. Grier, 217 Mo. l. c. 459-460; Schierbaum v. Schemme, 157 Mo. 1.]

The absolute ownership of property implies the right of arbitrary disposition of it according to the loves, hates or caprices of the grantor. [Weston v. Hanson, 212 Mo. l. c. 270 *et seq.;* Lorts v. Wash, 175 Mo. 505.]

The only limitation of the power of the owner to alienate his property (aside from coercion, fraud, lack of mentality) exists when it is shown that the will, deed or other instrument of conveyance was made at a time when the volition of the grantor was destroyed to the extent that the instrument then executed expressed, not his own intentions and wishes, but the different designs and objects of those who controlled his actions. [Seibert v. Hatcher, 205 Mo. l. c. 100; Tibbe v. Kamp, 154 Mo. 545; Thompson v. Ish, 99 Mo. 160; Jackson v. Hardin, 83 Mo. 175; Conner v. Skaggs, 213 Mo. l. c. 348.]

A careful and painstaking study of the testimony given on the trial wholly fails to afford any legitimate inference that the will propounded was made by the testator under a state of mental subjection, at the time, either to the favored child or to the widow or both. There is much evidence that the plaintiffs "thought" this was so, but no legal basis for that conclusion. The supposition on their part was ap-

parently grounded on the fact of their disinheritance, an alleged statement by the widow that if she had her way they would not get a penny, and the statement of the devisee that it had all been willed to him, and the testator had done as he requested ''about everything,'' and had orally told him to divide with two of the plaintiffs.

There is no evidence whatever that the widow in fact compelled the testator to exclude the plaintiffs, nor that Loarn Hayes (the devisee) did so. Indeed, the latter admitted that his father told him, when he informed him of the contents of the will, that he might divide with two of his brothers. This verbal suggestion of the testator, not contained in his will, did not create a precatory trust enforcible against the devisee. It was simply advisory. It may be that brotherly affection will dictate compliance with his father's suggestion in that regard, and thus put at rest any suspicion of unfair conduct on his part. But the law does not undertake to enforce duties of imperfect obligation. These rest *in foro conscientiae.*

In order to imply a trust from the use of precatory words, the terms employed for that purpose must be inserted in the will or other instrument of settlement, and used in an imperative sense as to a certain subject and a certain object or person. [1 Perry on Trusts (6 Ed.), sec. 114, note 1; Lewin on Trusts, (11 Ed.), p. 152, sec. 111.] The subject-matter of devise in the case at bar was real estate. The terms relied upon to show a trust rested in mere oral declarations of the testator to the devisee, and were not inserted in the will. In such case neither under the Statute of Frauds nor the Statute of Wills could any trust be decreed by a court of equity. [R. S. 1909, secs. 537 and 2868.]

There was some evidence tending to show that the testator at various times said the reason he did not give anything to his other children was to keep

down dissensions in his family. These remarks were not contemporaneous with the making of the will. They were only evidentiary of the state of mind of the testator, not of their truth. They can not be taken as proof of undue influence. [Teckenbrock v. McLaughlin, 209 Mo. 1. c. 550; Crowson v. Crowson, 172 Mo. 1. c. 703; Rule v. Maupin, 84 Mo. 587.]

The only witness who testified as to his state of mind when the will was drawn, states that it was read over twice to him, and in every respect conformed to his wishes and instructions. At the time the will was drawn by his lawyer, he declared to him (the lawyer) in positive terms that he intended by his will to leave to his wife just what she would be entitled to receive under the statutes, and he intended the remainder of his estate to be given to the one child named therein. His further communications at that time to the draughtsman disclosed that his state of mind on that subject arose from the dislike which he entertained against his other children, caused by disputes, affrays, altercations and animosities between himself and his excluded children, and by the action of some of them in erecting a tombstone to their mother without inscribing thereon that she had been his wife. There is no substantial evidence in this record that the testator was swayed by any other motives than thus created when he made the will in controversy. He was a man of irascible temper, strong in his affections, equally unyielding in his dislikes, of fixity of purpose, and firmness of character. Possessed of such a disposition, it is easy to see, from the evidence in this case, how he came to make the will in suit, and that it reflected only his own intentions in the disposal of his estate.

From the standpoint of moral duty on the part of the parent, the will in question should not have been made, nor should the state of mind on the part of the testator which dictated it have been maintained by

him against his offspring at the time of his death; but his delinquencies in these respects cannot be corrected by judicial procedure, which is powerless to deprive a person of competent testamentary capacity from making any will expressive of his own purposes and intentions (however unethical) which do not contravene a rule of law or offend public policy.

Our conclusion is that the learned trial court should have told the jury at the close of the trial that there was no evidence that the will propounded had not been duly executed by the testator. The judgment herein is accordingly reversed, and under the ruling in Bradford v. Blossom, 207 Mo. l. c. 231, and other cases, judgment is entered here probating the will in solemn form. *Brown, C.,* concurs.

PER CURIAM.—The foregoing opinion of BOND, C., is adopted as the opinion of the court. All the judges concur.