WALTER J. MCCORMACK et al., Plaintiffs (Respondents), v. ROBERT STANLEY BERKING, Individually and as Executor of the Estate of LUELLA MCCORMACK et al., Defendants (Appellants), No. 44975—290 S. W. (2d) 145.

Division One, April 9, 1956.

Motion for Rehearing or to Transfer to Banc Overruled, May 14, 1956.

*Walter A. Raymond* and *William M. Day* for appellants.

914

*Albert L. Rendlen, Rendlen & Rendlen* and *Charles B. Blackmar* for respondents.

[146] HYDE, J.—Will contest, involving title to real estate; verdict and judgment for contestants and proponents have appealed. The only issue on this appeal is whether contestants made a submissible case on undue influence. We will, therefore, state the facts shown by the evidence most favorable to contestants.

Mrs. Luella (also called Lula) McCormack, hereinafter referred to as testatrix, made two wills; one was dated January 8, 1931, with similar provisions to one made by her husband, Henry McCormack, at that time; the other will was made December 1, 1949, after the death of her husband who died December 7, 1946. The judgment adjudged that the writing of December 1, 1949, was not the last will of the testatrix, in accordance with the verdict of the jury; and, reciting that it had been stipulated that the writing of January 8, 1931 had been duly executed and witnessed, adjudged that writing to be the last will of testatrix.

By the 1931 will, testatrix left all of her property to her husband if he survived her but if he did not survive her, by one calendar month, then 2/3 of her estate was to go to her brother-in-law, Walter J. McCormack and 1/3 to her sister, Laura Douds. Her sister died in 1947 and contestants other than Walter J. McCormack were her brother, a niece and two nephews, children of a deceased brother. The 1949 will left all of testatrix's property to Robert Stanley Berking (hereinafter referred to as Stanley) and provided that if he did not survive testatrix then all of her property should go to his wife Alice L. Berking. Stanley was a nephew of testatrix's husband, a son of his deceased sister. The 1949 will appointed Stanley executor without bond and authorized him to sell the property of the estate "upon such terms and for such consideration as he may approve."

Testatrix was married about 1903 to Henry McCormack. His family opposed their marriage except his younger brother Walter. Stanley's mother and the other brothers and sisters never had friendly relations with testatrix and her husband and "never buried the hatchet."

However, relations were very friendly between testatrix and her husband and Walter McCormack and his wife, called "Mame" by testatrix, who lived in Hannibal. The families visited in each others homes throughout the years and kept up correspondence between them. Testatrix and her husband both originally lived in Hannibal but, after their marriage, went to Kansas City, where he worked for a railroad. In 1922, Stanley and his wife [147] moved to Kansas City and he also engaged in railroad work. In 1925, Stanley lost a leg in an accident for which he brought suit and received a settlement. He remained in Kansas City until 1930, being employed by an artificial limb manufacturer and a law firm. In 1930, he moved to New London where he bought and operated a drug store. Stanley and his wife both said that during the time they lived in Kansas City, they were very friendly with testatrix and her husband and visited with them frequently, seeing them about every week.

Testatrix and her husband later moved from Kansas City to a place on Highway 50 near Lee's Summit. George Beard and his wife Hattie Beard lived across the street from them and Mr. Beard and Henry McCormack were employed by the same railroad. In 1945, Henry McCormack's health failed and he finally became mentally deranged. Mr. and Mrs. Beard helped testatrix take care of him. He died December 7, 1946 and was buried December 9th. Walter and Mame McCormack and Stanley came for the funeral. After the funeral Stanley drove deceased's Ford car back to New London and Walter and Mame McCormack rode back with him. Stanley told testatrix he could get a better price for the car in New London than she could get in Kansas City. However, she had one offer of $400.00 and another offer of $500.00; but, in April 1947, she got Stanley's check for $200.00 for it. Stanley first said this check was mailed to her but when it appeared that the check had been cashed in Hannibal he decided it had been delivered to her when she was there taking care of her sister Laura Douds. Testatrix had written Walter and Mame McCormack in January 1947 saying she had not heard from Stanley about the car and that she was sorry she let him take it. She wrote them later telling them about offers she had for the car and saying that she did not give the car to Stanley and that if he thought so he was "very much mistaken." There was also testimony that testatrix said Stanley took all of her husband's tools. In one of these letters, testatrix said she called Stanley to come when Henry was so bad saying: "I was so much in trouble I did not know who to call." It was also shown that testatrix opened a joint savings account for herself and Stanley on December 3, 1946 at the Traders Gate City National Bank of Kansas City, where she did all of her banking business. This account stated it was "as joint tenants, payable to either of them or the survivor of them." Stanley said testatrix asked him to go on this account after her husband's death and that he had gone home

after the funeral and come back again before this was done. His only explanation of the fact that the account was shown to have been opened before Henry McCormack's death was that the bank record was untrue. This account was closed November 7, 1949 and the balance of $4,221.32 transferred to a new savings account in testatrix's name only. Prior to that time a joint checking account had been opened, on October 27, 1949, in the names of testatrix and Mrs. G. S. Beard. (This was at the time testatrix went to the Bethany Hospital concerning what turned out to be her last illness.) This joint checking account was closed January 28, 1950, a new joint checking account having been opened January 26, 1950, in the names of testatrix and Stanley, after she was in the Research Hospital. These joint checking accounts were for the purpose of getting bills paid during the illness of testatrix; balances of between $400.00 and $800.00 were maintained.

Early in 1947, testatrix went to Hannibal to take care of her sister Laura Douds, who was afflicted with cancer and died that summer. After her sister's death, testatrix stayed three weeks with Walter and Mame McCormack, during which time she consulted with Walter concerning business papers in the strong box she had with her and gave Mame a diamond stick pin. She discussed her will, made in 1931, showed them a copy (they had been told about it before) and told them "if anything ever happened, to get here as soon as we could and then contact Mr. Thice in regard to the will." Mr. Thice was the lawyer who drew the will and the original had been [148] left with him. After she went home, she thanked them several times in letters with such expressions as: "I don't know what I would have done without you and Walter. You were so good to me. I will never forget you. You are the dearest ones I have left and may God bless you both"; and "I think of you and Walter so many times and how good you people was to me when poor Ruby was so bad. I don't know what I would have done without you." According to Stanley, he and his wife drove over and visited testatrix, perhaps a dozen times, while she was in Hannibal in 1947, and on July 4th she spent the day with them in New London. In 1948, testatrix decided to buy a house in Kansas City and move there. She had Walter and Mame come up and look at the house before she bought it; and she moved into it in the fall of 1948. During 1948 and 1949, she wrote them friendly letters, with invitations to visit her, and also would call Mame by telephone. In the summer of 1949, testatrix's health failed and she became very ill that fall. She could not retain food and it developed that she had an abdominal cancer. Mrs. Beard was usually with her in the daytime and another woman stayed with her at night. Testatrix had much pain from her condition and took much medicine for relief. She lost fifty pounds of weight during her illness. On October 25, 1949, she called Mame McCormack and asked her to come to Kansas City and she came the next day. Mame said testatrix said to her on the phone:

918

"When you come up don't tell the Berkings I am sick, do not let them know you are in Kansas City or coming, promise me that." After Mame arrived she had the following conversation with testatrix, who said: "Did you tell the Berkings? and I said 'no I did not.' She said, 'Did you tell anybody because I don't want them in my house', and I said 'yes, I only told my sister.' She says, 'She will tell them.'" Testatrix went to Bethany Hospital where the doctors wanted her to stay for about three weeks. However, she only stayed from October 26th to November 1st. Mame said she intended to go home for a few days, get Walter settled comfortably and come back. However, when she and Mrs. Beard went to the hospital, testatrix said she had made the doctors dismiss her and was going home. She said: "I am afraid to leave my house empty. I am afraid the Berkings will come. I don't want the Berkings to come and get in my house while I am away." Mame went home in a few days leaving self-addressed postcards to be sent to her about testatrix's condition. These were sent to her by Mrs. Beard during November. The Beards said testatrix told them "not to tell the Berkings she was sick and not to give them the keys" (to her house); and also said to them: "Whatever you do, don't give these keys to Stanley Berking, or call him." Mr. Beard also said testatrix told him she did not want Stanley up there; and that "if he comes, he would make her do whatever he wanted her to do."

The Berkings did arrive about November 27th and stayed until December 5th. The will leaving everything to them was executed on December 1st. W. M. Day, the lawyer who prepared it, and with his wife witnessed it, said someone at the Traders Bank (he did not remember who it was) told him that testatrix wanted to see him. He said he made an appointment to see her the next morning (November 30th) and stopped and talked to her for about 30 minutes, seeing no one else in the house at that time. He went back the next morning (December 1st) and the will was signed by testatrix, and that he and his wife signed as witnesses. He said testatrix then folded it up and put it in her pocketbook. Mrs. Berking was in the back part of the house and testatrix called her in after the will was executed and introduced her. As they were going out the front door Stanley came in. Thereafter, Stanley had the will and the abstract to testatrix's house in New London and later brought the will to Kansas City and delivered it to Mr. Day, who had prepared it, and he had it when testatrix died. Stanley's explanation of his possession of it was that as he and his wife were starting to drive back to New London on December 5th, testatrix brought out the abstract to her house and put it in the back seat of his car; and that they put [149] the abstract in their strong box when they got home. The Berkings said they did not know the will had been made and did not learn about it until January 1950 when they visited testatrix at the hospital and she asked them if they

had found the will. When they said "no", she told them she had put it in the abstract and when they went home they found it there, having never seen it before. Walter McCormack said that after testatrix died Stanley said Mr. Day had her will and suggested they go down and have him read it. He stated he said: "How do you know Mr. Day has got a will?" and that Stanley said: "I called him up and told him to come out and make one." (This was denied by Stanley.) Mame McCormack said Stanley said to her about testatrix: "Lulu hasn't known what she has been doing for the past six months." Mrs. Beard also expressed the same opinion about testatrix. Mrs. Beard also said that after the Berkings went home in December 1949, testatrix told her "Stanley brought a lawyer and his wife out and had her will fixed"; and that testatrix also told her "she wasn't satisfied with that will * * * didn't want it fixed up" and said "when she got well, she was going to make out a new will."

After the Berkings went home in December 1949, the Beards continued to care for testatrix. They said about the last of December she got very bad and the doctor said she should be in the hospital. She said they did not want the responsibility and tried to call Mame but couldn't get her. The Beards said testatrix did not want them to call Stanley but they finally called him. After he arrived, testatrix went to the Research Hospital December 30, 1949 and died March 1, 1950. The Berkings moved into her home and stayed there during that time except for two short trips home. On admission to the Research Hospital, testatrix was described as "a senile, white female appearing acutely ill." The final diagnosis showed adenocarcinoma, involving the entire abdominal, thoracic and genito-urinary systems, arteriosclerotic heart disease and general arteriosclerosis, two large gallstones, terminal azotima (a blood disease) and terminal bronchopneumonia and pulmonary complications. Walter and Mame McCormack came to Kansas City in February 1950 and stayed about a week. They said the Berkings made them feel unwelcome and that Mrs. Berking told Walter to take Mame home, saying she didn't want her there because she might get sick and she would have her on her hands too. They said Mame's health was good. While they were in Kansas City, the Berkings would take them to the hospital to see testatrix but would never leave them alone with her. They also said that while they were there Stanley often sang, whistled or hummed the song "Everything's Going My Way". It was also shown that Stanley painted the bedrooms and put a new lineoleum in the bathroom during his stay there before testatrix died. On the day they left, Mame said they went to the station early and she took a taxi to the hospital and got to see testatrix alone. She said testatrix said: "I am glad you are here because I want to tell you something * * * I have to change that will. * * * I have to get Ruby's name off that will." (Ruby was her deceased sister who was named only in the 1931 will.)

The 1949 will was filed for probate on March 1, 1950, the same day that testatrix died. Testatrix was 76 at the time of her death; Walter McCormack was near the same age, having worked for his company (International Shoe) 55 years at the time of the trial, and Stanley Berking was 62 at that time.

Stanley denied having had anything to do with making the will or knowing anything about it until testatrix told him in January 1950 that it was in the abstract he had in New London. He had the testimony of a neighbor of testatrix that she had given her Stanley's address and telephone number and said if anything happened to her to call the Berkings immediately; and also said she wanted Stanley to have everything she had. He also had the testimony of another woman, a friend of testatrix, that testatrix told her that she and her husband were leaving their property to each other and the last one was to leave it [150] to Stanley, saying: "He is the only one that does anything for us or looks after us"; and also showed her Stanley's name on her bank account. He also had the testimony of a nurse at the Research Hospital, who said testatrix told her how grand Stanley was to her "and how much she depended on him to do things for her." Stanley said one day in January 1950, testatrix (at the hospital) said: "I have done you a grave injustice and I just feel kind of bad about it." He asked her what it was and she said: "I had you taken off that checking—that savings account of mine." He said: "I asked her how she come to do it and she said my Aunt Mame had her take it off." He said he and his wife stayed in testatrix's house, while she was in the hospital, at her request; and that she gave them the key. He also said Walter and Mame McCormack were alone with testatrix at the hospital several times during their visit in February 1950.

Defendants correctly say that the law favors freedom in the testamentary disposition of property and that the burden was on contestants to prove the 1949 will did not represent the will of the testatrix but was the result of proprononents' undue influence. However, as defendants concede, undue influence need not be shown by direct evidence but can be shown by circumstantial evidence as a reasonable inference from other facts and circumstances. They also correctly say that statements and declarations of testatrix do not constitute proof of facts stated therein (the jury was so instructed) but only are admissible to show her state of mind and susceptibility to influence. (State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S. W. (2d) 360 and cases cited, l.c. 361.) However, we cannot agree with their contention that there was no evidence that testatrix was in such mental and physical condition as to be susceptible to undue influence. They cite Beckmann v. Beckmann, 331 Mo. 133, 52 S. W. (2d) 818 (where the will was made five years prior to the testator's death and the ailment shown was only during the last three years of his life); Bushman v. Barlow, 316 Mo. 916, 292 S. W. 1039 (where there was

not an unequal division, although shares were placed in trust, and the will was substantially the same as a former will as to which no undue influence was claimed); Larkin v. Larkin, Mo. Sup., 119 S. W. (2d) 351 (where testator 68 made his will before going to the hospital for an operation for appendicitis and the evidence showed him to be a man of strong mind and will and "not old enough to be debilitated by reason of old age"); Snell v. Seek, 363 Mo. 225, 250 S. W. (2d) 336 (where testatrix was 83 but contestants' evidence did not show nature of illness or impairment of mental faculties and most of her property was left to her husband instead of adopted children.) In none of these cases were there, as in this case, declarations of the maker of the will showing anxiety over the likelihood of being influenced by the person charged with undue influence or an admission of such person that he had called the lawyer who made the will and told him to come out and make one. Even Stanley's testimony that testatrix told him that his Aunt Mame had had her take his name off the joint savings account indicates susceptibility to influence. Certainly the evidence of the character of testatrix's illness (wide spread cancer which kept her in pain, required drugs for relief and made it difficult for her to retain food) and her condition at the time the will was made (senile, with arteriosclerosis) is very different from anything shown in the cases cited. (See Powell v. Raleigh, Mo. App., 244 S. W. (2d) 387.) While it is true, as defendants state, there was no evidence of mental incapacity, nevertheless our conclusion is that the declarations of the testatrix and contestants' other evidence was sufficient to show a state of mind susceptible to influence, if accepted as true by the jury.

■ Defendants' main contention is that the evidence is insufficient to show that they exercised undue influence in the execution of the will amounting to force, coercion or over-persuasion, which destroyed the free agency and will power of the testatrix, citing Gibony v. Foster, 230 Mo. 106, 130 S. W. 314; Hayes v. Hayes, 242 Mo. 155, [151] 145 S. W. 1155; Webster v. Leiman, 328 Mo. 1232, 44 S. W. (2d) 40; Larkin v. Larkin, Mo. Sup., 119 S. W. (2d) 351; Look v. French, 346 Mo. 972, 144 S. W. (2d) 128; Walter v. Alt, 348 Mo. 53, 152 S. W. (2d) 135; State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S. W. (2d) 360; Buckner v. Tuggle, 356 Mo. 718, 203 S. W. (2d) 449; Wright v. Stevens, Mo. Sup., 246 S. W. (2d) 817; Snell v. Seek, 363 Mo. 225, 250 S. W. (2d) 336; Michaelson v. Wolf, 364 Mo. 356, 261 S. W. (2d) 918; Glover v. Bruce, Mo. Sup., 265 S. W. (2d) 346; Aaron v. Degnan, Mo. Sup., 272 S. W. (2d) 216. In this connection defendants say the disposition made in the 1949 will was not unnatural because testatrix, at that time, had no blood relatives with whom she had any close relations; and they also say the evidence did not show a fiduciary relationship between Stanley and testatrix. (Since there was no joint bank account of testatrix and Stanley at the time the will was made

we will consider that no fiduciary relationship was in existence at that time.) It has frequently been held that the proof of a confidential fiduciary relationship and unusual activity in the preparation of a will by one who profited greatly from it over others for whom equal regard had been expressed by the maker of the will, made without the advice of a wholly disinterested person, the making of which was concealed by the one who profited by it, and made when the maker was susceptible to his influence is, with corroborating circumstances, a sufficient basis for a finding of undue influence. (Machens v. Machens, Mo. Sup., 263 S. W. (2d) 724; Bohnsack v. Hanebrink, Mo. Sup., 240 S. W. (2d) 903; Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772.) However, a finding of undue influence does not absolutely depend upon the establishment of fiduciary relationship but can be based on other facts and circumstances.

It is true, as the authorities cited by defendants hold, that a finding that testatrix's will was the result of their undue influence cannot rest solely upon suspicion, speculation and conjecture; nor is a showing of motive, opportunity to exercise undue influence and an unjust result enough to make a jury case; and to make a case of undue influence on circumstanial evidence, the circumstances must be of a sufficiently substantial nature to sustain an inference that the Berkings dominated and controlled testatrix's mind in making the will so that it stated their wishes and not hers. (See State ex rel. Smith v. Hughes, supra, 200 S. W. (2d), l.c. 363 and cases cited.) In the Smith case, we said: "The circumstances in evidence are just as much lacking in this respect as is the direct evidence because they do not show that Anna (charged with undue influence) had anything to do with the making of the will, or knew it was to be made or knew, at the time, it had been made." (In many of defendants' above cited cases there was no evidence of activity in making the will.) That is not the situation in this case, because there were circumstances to show what we said was lacking in the Smith case, namely: that the Berkings were in testatrix's home when the will was made and had been alone with testatrix there for several days before it was made; that Stanley said he called the lawyer and told him to come out and make the will; that Stanley took the will, and the abstract to testatrix's house, with him when he went home a few days after it was made and concealed the fact of its existence from the McCormacks; that the Berkings took over testatrix's house when she went to the hospital and prevented the McCormacks from being alone with her; and that the will was filed for probate on the very day that testatrix died. These facts considered with the letters and statements of testatrix showing her continuing close relations, gratitude and affection toward the McCormacks and her distrust of the Berkings, together with the facts that the will was made during testatrix's last illness (of the kind it was and with a condition of senility shown), that it completely changed the long

standing testamentary plan of her 1931 will (to leave most of her property to Walter McCormack) without any apparent reason and against her previously expressed desires, and that there was evidence of her susceptibility to influence, we think makes a substantial basis to sustain [152] an inference that the will was the result of undue influence by the Berkings. We think the facts and circumstances herein shown are very different from those in the cases upon which defendants rely and make as strong a case of circumstantial evidence of undue influence as those in Welch v. Welch, 354 Mo. 654, 190 S. W. (2d) 936 and Norris v. Bristow, 358 Mo. 1177, 219 S. W. (2d) 367, in each of which there was activity in making the will but no showing of a fiduciary relationship and in each of which we held there was a jury case. Of course, these facts and circumstances were far from conclusive, and while they were denied their truth was for the jury, but since the jury accepted them as true our conclusion is that the jury could reasonably infer from them that the will was the result of undue influence. We, therefore, hold the case was properly submitted to the jury.

The judgment is affirmed. All concur.