Clara Ann MALONE et al., Plaintiffs-Appellants,

v.

Martin E. SHEETS, Jr., et al., Defendants-Respondents.

No. 38161.

Missouri Court of Appeals, St. Louis District, Division Three.

Aug. 29, 1978.

**758**

Marshall, Littman & Ragland, Richard M. Marshall, Clayton, for plaintiffs-appellants.

Patrick M. Fiandaca, III, Steiner & Fenlon, Joseph A. Fenlon, Jr., Clayton, for defendants-respondents.

KELLY, Judge.

This is an appeal from a judgment of the Circuit Court of St. Louis County in a statutory will contest action wherein the contested will was held to be the Last Will and Testament of Ollie Edith Sheets, deceased. On appeal, the appellants—the contestants in the trial court—claim that the judgment for the respondents—the contestees in the trial court—should be reversed and a judgment entered by this court holding that the will in question was not the Last Will and Testament of Ollie Edith Sheets, deceased, because the making of the will was procured by the undue influence of one of the proponents, Martin E. Sheets, Jr.

The "Points Relied On" section of the appellant's brief raises three grounds upon which they rely for reversal of the trial court's judgment; these are: that the trial court erred (1) in excluding or unduly restricting appellants' evidence, (2) in admitting respondents' evidence, and (3) in failing to sustain appellants' Motion for a Directed Verdict at the Close of the Respondents' Evidence. For reasons hereinafter stated we hold that the trial court did not commit error in the respects charged and we therefore affirm.

Inasmuch as a will contest is an action at law and the weight of the evidence and the credibility of the witnesses are questions for the jury, when the sufficiency of the evidence to support the judgment is raised, the most favorable evidence rule applies. *Hemonas v. Orphan*, 191 S.W.2d 352, 362[11] (Mo.App.1945). Therefore, in reviewing the trial court's action denying the Appellants' Motion for Directed Verdict, we must view the evidence in a light most favorable to the respondents and we must indulge in every inference favorable to the judgment which men of average intelligence and fairness might draw from the proven facts in the case.

Viewed in this light, the jury could find from the evidence and the inferences therefrom that Ollie Edith Sheets (hereinafter Edith) was the second wife of Dr. Martin Sheets (the Doctor), and that there were two children of the Doctor's first marriage, Martin Sheets, Jr., and Dorothy Sheets. The Doctor married Edith in 1942, approximately one year after his first wife's death, at which time Edith was approximately thirty years of age, and the Doctor, sixty-five. Throughout the twenty-eight years of their marriage Edith and the Doctor had no children.

Dorothy Sheets, one of the Doctor's children of his first marriage, died in 1958, leaving two children surviving her. They are Lowell L. Frei and Doris Rightmeyer, two of the named contestees and respondents in this appeal.

Edith, at the time of her death on January 25, 1975, had no lineal descendants; she did, however, have eight half-brothers and half-sisters, and the two daughters of a full brother who had predeceased her. The appellants in this case are a group of Edith's half-brothers and half-sisters and the two nieces, Carol V. Kittelson and JoAnne Griffin, daughters of the deceased Donald Ellis, Edith's full brother.

During their life together, the Doctor and Edith owned various rental properties. Martin Sheets, Jr., (hereinafter Martin), one of the respondents, was an attorney-at-law, who performed various services for the couple during the early 1960s, including the preparation of their income tax returns. Sometime in 1963, however, the relationship between the Doctor, Edith and Martin became strained when Martin attempted to have the Doctor transfer all of the Doctor's properties to him. These efforts were unsuccessful, and for a time Martin ceased rendering those services he had previously performed for the Doctor and Edith because it appeared that they had some question about his trustworthiness and they did not want him involved in their financial affairs. Edith, at one point, opined that Martin planned to steal her property and he was not permitted any longer to sign checks on the joint account of the couple.

Sometime in 1968 a reconciliation took place between the Doctor and Martin, and during 1968 and 1969 the Doctor formulated an estate plan which was never reduced to writing. This plan, according to the testimony of the respondents, was that the property the Doctor had accumulated prior to his marriage with Edith was to be given to Martin and the two surviving children of Dorothy—Lowell L. Frei and Doris Rightmeyer. The property accumulated by the Doctor during his marriage to Edith was to be left to her for the remainder of her lifetime, and, upon her death, the remaining property was to revert back to Martin and the two children of Dorothy.

On October 19, 1969, the Doctor and Edith executed a General Warranty Deed transferring their interest in some real property on Kingsland and Kingsbury Streets in St. Louis County, Missouri: one half to Martin and his wife and the other half to Martin as "Trustee of the Dr. M. E. Sheets Trust."

In the latter part of 1969, Edith consulted with two attorneys in relation to the drafting of a will, and during conversations with them she told them that she wanted her property to go to her family of half-brothers and half-sisters, and that she wanted her will to provide a bequest of $2,000 to a grandnephew, David Griffin. A will with these provisions was prepared and executed by Edith on the 18th day of November, 1969. This will was received in evidence.

After Edith had consulted with the attorneys who drafted the November, 1969, will, one of the attorneys talked with the Doctor on the telephone and obtained information from him for the preparation of a will for the Doctor. A will was prepared and mailed to the Doctor with a letter telling him the requisite formalities of execution. The Doctor, in this will, devised his estate to Edith and recited that, whereas he had previously made provision for Martin, Lowell Frei and Doris Rightmeyer by means of certain deeds delivered and duly recorded in the City and County of St. Louis, he intentionally made no further provision in his will for them. This will was executed by the Doctor on March 5, 1970.

On September 17, 1970, Dr. Sheets died and shortly thereafter Edith once more consulted Martin on business matters. Martin became a co-signer with her on a checking account into which she deposited funds. In October, 1970, Edith consulted with another attorney and told him that she wanted a new will. This lawyer sent her a letter dated October 13, 1970, suggesting that she make an appointment to see him. Receipt of this letter upset her, so she asked Martin to prepare the will so she could avoid pay-

ing this lawyer a fee. Martin drafted the will, Edith came to his offices at the St. Louis County National Bank in Clayton, Missouri, where he was trust officer, on November 16, 1970, and she executed the will with Martin's secretary, his boss and another secretary in the trust department of the bank, as witnesses. According to the terms of this will, Edith bequeathed fifty percent of her estate to Martin and twenty-five percent each to Lowell Frei and Doris Rightmeyer.

Subsequent to the execution of this will, Edith deeded her 16 family apartment building to herself, Martin and his wife as joint tenants with rights of survivorship. Some short time later she also deeded her new residential property in joint names with Daniel Sheets, Martin's son.

There was ample evidence from which the jury could find that, although Edith had been hospitalized, underwent psychiatric care, had used phenobarbital to excess, and was treated for a manic depressive condition at one time, she was a person of strong will who was indomitable and not susceptible to undue influence by anyone.

Edith died on January 25, 1975, more than four years after she had executed the will of November 16, 1970, which is being contested in this proceeding.

In ruling on this appeal we shall initially consider appellants' contention that the trial court erred in failing to sustain their Motion for Directed Verdict at the close of the respondents' evidence. This motion, made after the respondents presented their evidence on the issues of undue influence, was:

> "I'd like to make a motion for a directed verdict, at this time, in that the defendants did not prove their burden of rebutting their presumptions in any way."

The trial court denied this Motion, and we think rightly so.

■ Will contests have been said to be in the nature of an appeal from an interlocutory order of the probate court probating the will in common form, and it is the contestee, in the first instance, who is re-

quired to make out a prima facie case. *Teckenbrock v. McLaughlin*, 209 Mo. 533, 108 S.W. 46, 47[1, 2] (1908). This burden remains on the contestee throughout the trial. *Brug v. Manufacturers Bank & Trust Company*, 461 S.W.2d 269, 276[8] (Mo. banc 1970). Although the appellants, as the contestants, did not question the testamentary capacity of the testatrix nor that the will was executed with the requisite legal formalities, the respondents, as the contestees in the trial court, nevertheless, had the burden of proving these elements of their case. *Fletcher v. Henderson*, 333 Mo. 349, 62 S.W.2d 849, 851[4] (1933).

■ With respect to whether the will was procured by undue influence the appellants, as the contestants in the trial court, had the burden of proving that the will did not represent the will of Edith, but was the result of undue influence exerted upon her by Martin. *McCormack v. Berking*, 365 Mo. 913, 290 S.W.2d 145, 150[3] (1956).

■ Nevertheless, because the evidence of all the parties was that this will was drafted by and executed under the supervision of Martin, an attorney-at-law and a beneficiary of a substantial portion of the testatrix's estate, a presumption that the will was procured by undue influence arose, *Pasternak v. Mashak*, 392 S.W.2d 631, 636[3] (Mo.App.1965), and the appellants made a prima facie case which did not disappear upon the introduction of rebutting testimony by the respondents, and an issue for the jury was thereby raised. *Pasternak v. Mashak*, supra, l.c. 636[4].

■ The effect of this presumption was to cast upon the respondents, as the contestees, the "never-shifting burden of proof . . . to establish that the will was executed freely and without such influence, even though the burden of evidence may be said to shift to [the] plaintiff upon proof that (the attorney-beneficiary who prepared the will) followed the suggestions and orders of [the] (testatrix) . . ." *Moll v. Pollack*, 319 Mo. 744, 8 S.W.2d 38, 45[3] (1928).

While this presumption is rebuttable, it is not a mere legal fiction or procedural rule; it rests on a substantial basis of fact or inference, "which go hand in hand, and really are the same thing. Hence, the presumption, with its underlying facts or inferences, *once being in the case, never does nor can disappear but raises an issue for the jury. * * *" Loehr v. Starke*, 332 Mo. 131, 56 S.W.2d 772, 776[3] (1932); *Simmons v. Inman*, 471 S.W.2d 203, 206[2] (Mo.1971); *Pasternak v. Mashak*, supra, l.c. 637[4]; *Pulitzer v. Chapman*, 337 Mo. 298, 85 S.W.2d 400, 412[11] (1935).

However, none of these authorities decide the issue presented here, i. e. the quantum of evidence a contestee must adduce to rebut the presumption of undue influence and thereby make a submissible case. Those cases deal with the question whether the contestant makes a submissible case of undue influence with the aid of the presumption.

Neither the appellants nor the respondents have cited to us any Missouri case ruling on this question. Our independent research has surfaced two cases which we believe are persuasive.[1]

In *Hegney v. Head*, 126 Mo. 619, 29 S.W. 587, 589 (1895) the court said:

"Such wills, when made to the exclusion of the natural objects of the [testatrix's] bounty, are viewed with great suspicion by the law, and some proof should be required besides the factum of the will before the will can be sustained."

In reaching this conclusion the court relied on *Marx v. McGlynn*, 88 N.Y. 357, 371 (1882). *Mowry v. Norman*, 204 Mo. 173, 103 S.W. 15, 19 (1907), in considering this same question, cited both *Marx* and *Hegney*, and quoted from *Maddox v. Maddox*, 114 Mo. 35, 46, 21 S.W. 499, 502, 35 Am.St.Rep. 734 (1893):

". . . and the onus is cast upon the beneficiaries to make explanation of the transaction, and establish its reasonableness."

■ We believe that the rule to be applied is that stated in *Bay v. Gillilan*, 92 Mo. 250, 5 S.W. 7, 11 (1887):

"Where confidential or fiduciary relations exist, and a gift be bestowed or a contract be made between such parties, then the party occupying the attitude of guardian, agent, trustee, medical adviser, etc., has the onus to bear of establishing the absolute fairness of the given transaction. . . . where such facts are proven as will authorize a jury to find the existence of undue influence, then the burden shifts, and it then devolves on the party charged to exonerate himself from such charge, in like manner as in the case of fiduciary or confidential relations."

The burden in cases involving one occupying a fiduciary or confidential relation where a prima facie case has been made giving rise to the presumption of undue

1. Other courts faced with this question have reached various conclusions. Some cases hold that the evidence necessary to overcome a presumption of undue influence arising from a testamentary gift to an attorney must be clear, convincing, and satisfying. See cases cited 19 A.L.R.3d 596, § 5[b]. See also: Annotation, Presumptions or Inference of Undue Influence From Testamentary Gift to Relative, Friend, or Associate of Person Preparing or Procuring Its Execution. 13 A.L.R.3d 381. In other cases it has been held that to overcome a presumption of undue influence arising from a testamentary gift to an attorney, the attorney need not establish the absence of undue influence by a preponderance of the evidence. *In Re Erickson's Estate*, 140 Cal.App. 520, 35 P.2d 628, 631[4] (1934). The Supreme Court of Iowa, in *Graham v. Courtright*, 180 Iowa 394, 161 N.W. 774, 780[12] (1917) held that in a case of this nature the attorney had only to meet the prima facie case against him by putting the evidence pro and con in equipoise, and the burden of proof remained upon the contestant at all times to prove undue influence.

However, the Utah Supreme Court in *Re Swan's Estate*, 4 Utah 2d 277, 293 P.2d 682, 693[18] (1956), held that the attorney-beneficiary once the evidence gives rise to the presumption of undue influence, then has the burden of persuading the trier of fact by a preponderance of the evidence that there was no undue influence, or in other words, by showing from the evidence that is more probable that he acted perfectly fairly with his confidant rather than merely by a prima facie showing to the contrary.

influence has been considered and ruled upon by the Supreme Court of this state in the case of *In re Patterson's Estate*, 383 S.W.2d 735 (Mo.1964). The court held, 383 S.W.2d l.c. 739[2], that once the fiduciary presents evidence on the issue, the validity of the gift became a mixed question of law and fact to be determined from all the evidence by the trier of fact.

*In re Patterson's Estate*, supra, involved a gift, however, in *Bridwell v. Swann*, 84 Mo. 455, 467[2] (1884) the court held that the presumption of undue influence must be rebutted "by competent and convincing proof" if the fiduciary is to enjoy the benefit of the will; and when there is evidence of this stature it is then the function of the jury, under proper instructions, to decide whether the rebuttal evidence was sufficient to repel the disputed influence. *Bridwell v. Swann*, supra, l.c. 469[5].

█ Respondents' evidence on this issue was that when the Doctor married Edith she was without any substantial funds; in fact, the Doctor paid for her divorce from her former husband and very shortly thereafter they married. After their marriage they agreed that whatever the Doctor had acquired during his first marriage would, upon his death, go directly to the respondents, and the remainder would go to Edith during her lifetime if he should predecease her; and then, upon her death, she would pass it on to the respondents. Pursuant to this plan, the Doctor, in 1969, conveyed that portion of his estate which had been acquired during his first marriage, partly in fee to Martin and his spouse, and partly in trust for Lowell Frei and Doris Rightmeyer. Following this, in March 1969, the Doctor executed a will leaving the balance of his estate to Edith. Two months after the Doctor died, Edith, despite the fact she had access to other counsel, requested that Martin prepare a will for her so she could avoid paying attorneys' fees to another lawyer for these services. Martin denied exercising any influence over Edith in the making and execution of the will and testified that the will conformed with her wishes. He further testified that he prepared the will only after he unsuccessfully attempted to have her go to other lawyers for its preparation.

Edith had discussed her will with others. Among these were Dr. Robert D. Brookes, her psychiatrist, who testified that in October, 1971, Edith told him that she had left her estate to Dr. Sheets' family. Clair F. Lypka, a friend, testified that Edith told her shortly prior to Edith's death, that her will was in order and everything was to go to the Doctor's family. There was also testimony from Dr. Brookes that on an office visit on October 27, 1971, Edith told him that she had arranged her will so that the property which she got from Dr. Sheets would revert to Martin in case of her death. She also told him that she believed her step-brother and step-sister did her in and took savings of hers at one time and that they had taken some of her property out of the place where she was living while she was in the hospital. There was also much evidence by both parties that Edith, during the time this will was prepared, was fully competent, capable of handling her own affairs, and was one who was not susceptible to undue influence. This will was executed on November 16, 1970, and Edith died on January 25, 1975; there is no evidence that she revoked or made any changes in this will during the intervening four years and two months, nor that she at any time conveyed to anyone any indication that this will did not dispose of her estate in accord with her wishes.

We conclude that this evidence adduced by the respondents on the issue of undue influence made that issue a mixed question of law and fact to be determined from all of the evidence by the trier of fact—the jury—and that the trial court properly denied the appellants' Motion for Directed Verdict and submitted the case to the jury.

Appellants' other two Points Relied On for reversal of the trial court's judgment are directed at evidentiary rulings made during the course of the trial. The first point consists of four separate sub-points whereby evidence appellants sought to introduce was excluded; the second, a ruling admitting into evidence testimony of the

respondents concerning an oral agreement the Doctor and Edith had relative to the disposition of her estate upon her demise.

Because appellants' first sub-point under Point One concerns testimony relative to declarations of the testatrix made to the attorney who prepared her November, 1969, will concerning an estate plan she and the Doctor had, and their Second Point is directed against the admission of declarations of the Doctor and the testatrix made to the respondents on a number of occasions prior to the execution of the same will, that on Edith's death the property she had received from the Doctor's estate would go to the Doctor's heirs, we shall consider these two grounds together.

Prior to ruling these Points we are of the opinion that the law on this subject should be reviewed.

■ Generally, wide latitude of evidence is permitted in a will contest where the ground for voiding the will is undue influence. *Canty v. Halpin*, 294 Mo. 96, 242 S.W. 94, 96[6] (banc 1922). This is so because a person intent on exercising undue influence will do so in as subtle, furtive, indirect and elusive manner as possible; and, therefore, undue influence may be shown indirectly by the reasonable and natural inferences drawn from the facts and circumstances proved, i. e. by circumstantial as well as direct evidence. *Salisbury v. Gardner*, 515 S.W.2d 881, 885[4] (Mo.App.1974).

In *Thompson v. Ish*, 99 Mo. 160, 12 S.W. 510, 512, 513[3] (1889) the court said:

"The triers of the facts should be placed in the position of the testatrix, as near as possible, so as to be able to consider all the evidence from her point of view, when she made the will in dispute."

■ The general rule in this state is that declarations of a testator or testatrix, not made contemporaneously with the execution of the will or so near thereto as to constitute a part of the res gestae, are not competent as direct or substantive evidence of the truth of the matters therein stated when offered on the issue of undue influence in the making of the will being contested. *Hammonds v. Hammonds*, 297 S.W.2d 391, 397[10] (Mo.1957); *State ex rel. Smith v. Hughes*, 356 Mo. 1, 200 S.W.2d 360, 361[2] (banc 1947); *Minturn v. Conception Abbey*, 227 Mo.App. 1179, 61 S.W.2d 352, 360[10] (1933).

■ However, evidence of declarations of a testator or of a testatrix, not a part of the res gestae, have been held admissible to show the state of mind of the testate, *Doll v. Fricke*, 237 Mo.App. 1148, 171 S.W.2d 755, 758[5, 6] (1943), and his or her susceptibility to influence, *McCormack v. Berking*, 365 Mo. 913, 290 S.W.2d 145, 150[5] (1956). It is the state of mind and the susceptibility to influence of the testate at the time of the making of the will which is in issue and except where the declarations shed some light on the state of mind or the susceptibility to undue influence during that time period they should not be admitted without some confirmation of a same or similar tenor over a period of years. *Gott v. Dennis*, 296 Mo. 66, 246 S.W. 218, 224[8] (1922).

Turning now to the issue under consideration, we feel it necessary to relate the circumstances giving rise to these problems.

Appellants, during their case in chief, called as a witness, Robert Hartzog, an attorney associated in the practice of law with another attorney, James E. Dearing. According to the evidence, Mr. Dearing and his family were acquainted with Dr. Sheets through Masonic activities. Sometime in October, 1969, after the Doctor and Edith had executed the trust agreement of October 19, 1969, wherein both gave approximately half of their joint estate to Martin and his wife, and half to Martin in trust for the Doctor's two grandchildren, Lowell Frei and Doris Rightmeyer, Edith called at Mr. Dearing's office to have a will drafted for her and the Doctor. Preparatory to drafting the will for Edith, Mr. Hartzog interviewed her, and appellants sought to adduce from him certain statements she had made to him to the effect that she and the Doctor had already provided for the Doctor's heirs by the trust instrument and did not plan to leave them anything else.

At trial, Mr. Marshall, counsel for the appellants, inquired of Mr. Hartzog concerning the instructions given to him as to how Edith wanted her estate distributed and elicited from him the provisions of the will he prepared pursuant to those instructions. In that will Edith left everything to the appellants, save for a $2,000 bequest to her grand-nephew, David Griffin.

Having developed this, Mr. Marshall then inquired whether Edith indicated to Mr. Hartzog any strong feelings of any kind as to why she wanted to have these provisions in her will, and he replied "yes." The following then took place:

"Q. And what was that indication?

A. She said that she and the Doctor had arranged an estate plan—"

At this point counsel for the respondents interposed the following objection:

"I will object to the question and the answer, that the last part of that is not responsive and deals with objected subject matter, and I ask it be stricken and the witness be instructed to (sic) the question yes, or no, and Mr. Marshall (sic) instructed not to delve into matters that the court has already ruled on."

Appellants' counsel was directed to rephrase the question, and the interrogation continued:

"Q. Did you discuss with Mrs. Sheets her feelings as to what she wanted done with her property?

A. Yes.

Q. And what was the extent of the discussion as to what she wanted to do with her property and why?"

An objection followed, directed to the "why," on the grounds that the will was the best evidence of what Edith wanted done with her property. The court ruled:

"I will sustain the objection. He has testified as to what she wanted, and I think we are getting into an awfully dangerous area."

A lengthy discussion, out of the hearing of the jury, ensued and culminated with the trial judge's statement that he was sustain-

ing the objection because the state of mind of the decedent a year before she executed the will in question and what indication she gave to her attorney at that time were immaterial.

Appellants, in their "Points Relied On" and "Argument" sections of their brief, state that the objection "was that the testimony was privileged attorney-client matter and hearsay." In this contention the appellants are in error; as a matter of fact, that objection, made earlier in Mr. Hartzog's testimony was overruled, and the witness was permitted to relate the instructions he was given by Edith as to how she wanted to dispose of her estate.

As a further grounds the appellants, in the "Points Relied On" portion of their brief, also contend that the trial court erred in excluding this evidence on the ground it was immaterial. The evidence they have reference to is the testimony of Mr. Hartzog explaining "why" Edith wanted her will drawn this way, i. e. in accordance with the estate plan of the Doctor and Edith whereby these respondents would be left nothing in the Doctor's will because they had already been amply provided for by him during his lifetime and Edith could thereafter dispose of that portion of the jointly owned property left to her in the Doctor's will as she saw fit. If we correctly comprehend the appellants' position, gleaned from their brief and the oral arguments in this court, this evidence is material because it is circumstantial evidence of one of the factors or circumstances the court in *Salisbury v. Gardner*, supra, said should be considered in determining questions concerning the exercise of undue influence, i. e. "whether the will makes an unnatural disposition of the estate and represents a sudden change from former wills." 515 S.W.2d l.c. 886.

■ The crucial question then is whether declarations of a testate as to the manner in which he or she intends to dispose of his or her estate are admissible.

There is a split of authority on the subject.[2] However, we believe the law in this

---

**2.** One line of cases holds such evidence admissible in accordance with the general principle

that a testate's declarations are admissible to show his feelings. *In re Thompson's Will*, 248

state is well settled, and declarations by a testate in cases where the will is under attack on the grounds of undue influence are admissible where they shed light on the intentions of the testate with respect to the disposition of his or her estate and to his or her susceptibility to undue influence, provided said statements or declarations are made at or near the time of the execution of the will in question, *Wilhoit v. Fite*, 341 S.W.2d 806, 817[21] (Mo.1960), but they do not constitute proof of the facts stated therein. *McCormack v. Berking*, supra.

█ The tenor of this excluded statement of the testatrix to Mr. Hartzog, at best, explained why she wanted her 1969 will drafted the way it was. It was evidence of her state of mind at that time— October and November, 1969. If admitted, it could have come in for the sole purpose of evidencing her state of mind at that time and not as substantive evidence of the plan she and the Doctor had devised. It would, therefore, have been merely corroborative of the will itself, and the exclusion of evidence which is merely cumulative is not prejudicial error. *Creager v. Chilson*, 453 S.W.2d 941, 944[7] (Mo.1970).

█ Appellants' second "Point Relied On" is directed to the trial court's admission into evidence, over objection that the evidence was hearsay, violated the statute of frauds, and was in violation of §§ 451.220 and 474.220 RSMo.1969, which require all marriage contracts to be in writing, the testimony of Lowell Frei, Doris Rightmeyer and Martin Sheets, Jr., concerning oral statements by both the Doctor and Edith which were made to them, that on Edith's death the property which she had received from the Doctor's estate would revert back to the respondents as his heirs.

During Mr. Frei's testimony in chief, respondent's counsel inquired whether the Doctor and Edith, together, had discussed with him plans for disposition of "their estate." He responded yes, and that the "last time" they did so was in 1968 "or in that area." He then went on:

"He was going to divide what he accumulated before he married Edith. My uncle was to get half, my sister and myself were to get a fourth, which is my mother's half, and then what was accumulated while they were married would go to Edith until the time of her death; and it was supposed to be split the same way at the time of her death. In other words, revert back to the Sheets family."

During Ms. Rightmeyer's testimony in chief she was permitted to testify that prior to the Doctor's death she had occasion to discuss with the Doctor and Edith, together, what they planned to do with their estate on numerous occasions; the last time, several years prior to the Doctor's death. According to her testimony, "they" told her that everything that had been acquired before her grandfather's marriage would revert back to the Sheets family and then the other portion would go to Edith.

Finally, during Martin's testimony in chief, he was permitted to testify that during the time Edith and his father were alive, on numerous occasions, they discussed Edith's plans for the disposition of "their estate." These discussions took place when she was telling him how his father wanted to dispose of his estate and they occurred so many times that it was a matter of common knowledge in the family. She told him the plan was very definite, that what his father had acquired while he was married to Mar-

N.C. 588, 104 S.E.2d 280, 288[16] (1958); *In re Holloway*, 195 Cal. 711, 235 P. 1012, 1019[10] (1925). A second line of cases holds that those declarations of a testate showing the same general intention as that embodied in the will are admissible to show a continuity of purpose. *Howell v. Howell*, 210 Ala. 429, 98 So. 630, 632[8] (1923); *Snyder v. Cearfoss*, 190 Md. 151, 57 A.2d 786, 789[2] (1948). And in some jurisdictions a declaration by a testate as to the way

in which he or she means to dispose of his or her property is held to be admissible as evidence of a general plan by which the testate wants his or her property distributed if the declaration coincides with the general plan embodied in the will, but inadmissible if in conflict therewith. *Chedel v. Mooney*, 158 Ga. 297, 123 S.E. 300[2] (1924); *Baker v. Baker*, 202 Ill. 595, 67 N.E. 410, 416[4] (1903); *Mosher v. Thrush*, 402 Ill. 353, 84 N.E.2d 355, 357[4] (1949).

tin's mother, and before he married Edith, was to go to the Doctor's family; at his death, what he had acquired after he had married Edith was to go to her, and at her death was to revert back to the Doctor's family.

We conclude that under the peculiar circumstances of this case there was no error in admitting this evidence in rebuttal to the appellants' charge that the will of November 16, 1970, was the product of undue influence. According to this evidence, these declarations of the Doctor and Edith were jointly made over a long period of time, and support the general plan set forth in Edith's will; they also show the mental state of the Doctor and Edith with respect to the disposition of their property and their affection for the Doctor's heirs. *Gott v. Dennis,* supra. The fact that she permitted this will to stand unchanged for four years after its execution is further support for the inference that it was not the product of undue influence but the carrying out of the plan she and the Doctor had devised for the disposition of his property left to Edith when he died. *Wilhoit v. Fite,* supra.

Appellants' contentions that this "agreement" was violative of the Statute of Frauds and the Statutes requiring marriage contracts to be in writing and was for that reason inadmissible, are likewise without merit. This evidence was admitted solely for the purpose of rebutting the appellants' contention that this will was the result of undue influence, and whether the agreement was enforceable was not germane to the purpose for which the evidence was admitted. It went solely to the state of mind of Edith at the time the declarations were made and to show a continuity of purpose in carrying out the estate plan.

For the foregoing reasons we hold that the trial court was not guilty of error in admitting into evidence those declarations of the Doctor and Edith relative to their plan that all of the property owned by the Doctor and Edith was to go to the Doctor's heirs when Edith died.

Appellants' second sub-point under Point 1 of their brief is that the trial court erred in excluding the testimony of Charles Jensen, an accountant for the Doctor and Edith relative to their estate plan and in refusing to allow into evidence the Estate Tax and Gift Tax returns of the Doctor and Edith which were filed following the death of Dr. Sheets and the execution of the trust instrument of October 19, 1969, respectively.

The appellants contend that this evidence was admissible as circumstantial evidence to support their theory that the estate plan of both Edith and the Doctor was that by reason of the inter vivos transfer of that portion of the Doctor's properties which were acquired during his first marriage to these respondents, they should not be entitled to anything further and Edith could do with that portion of the jointly-held properties devised to her by the Doctor as she chose, without any obligation to leave anything to these respondents upon her death.

What we have previously held with respect to Edith's declarations to Mr. Hartzog is equally applicable here with respect to any testimony Mr. Jensen might have given concerning the estate plan of the Doctor and Edith, and appellants are not entitled to a reversal of the judgment in this case on this ground.

■ Despite the fact the trial judge would not receive into evidence the Gift Tax Return and the Estate Tax Return filed with respect to the Doctor's estate, evidence of the contents of these Returns— with the exception of the monetary values of the properties involved—and the details of the gift were disclosed in the testimony of the respondents. Appellants do not contend in this court that the values of these properties are material; their argument is limited to the circumstantial importance of this evidence to support their version of the estate plan of the Doctor and Edith. Under these circumstances we hold that inasmuch as testimony of the contents of the Returns—save for the values of the properties transferred to the respondents by the trust instrument and the disposition of the remaining property following the Doctor's death was in evidence, no prejudicial error was suffered, and this Point is no basis for reversing the trial court's judgment.

Appellants' third sub-point under Point I of their brief is that the trial court erred in excluding a pleading filed by the respondent, Martin Sheets, Jr., in a companion case, wherein he contended that Edith was the victim of undue influence at a time when she was feeble, infirm and under the influence of drugs.[3]

The pleading appellants sought to introduce into evidence in the trial court has not been incorporated into the transcript of the record on appeal, and so far as we have been able to ascertain from a study of the record and the parties' briefs, it was an Amended Answer filed by Martin Sheets, Jr., in a lawsuit wherein Ms. Griffin and Ms. Kittleson sought a declaratory judgment declaring title to a certificate of deposit and a savings pass book to be in themselves.

The appellants argue that this pleading, if admitted, would have shown that Martin alleged therein that this testatrix was susceptible to undue influence and was "unduly influenced at a time when she was feeble, infirm, and under the influence of drugs," a position contrary to his position in this case that Edith was a capable, forceful woman, nearly impossible to influence. For this reason, appellants contend, that this Amended Answer was admissible as an admission against interest.

Respondents' counsel, in the argument portion of the brief, says with respect to this pleading:

"The pleading was filed by Proponent Sheets and he alleged Edith Sheets was unduly influenced by the two nieces and under the influence of drugs."

█ The responsibility for affording an appellate court a record upon which it can properly review the actions of a trial court rests on the party taking the appeal from the judgment of the trial court. Rule 81.-12(a) and (b). Not only have the appellants failed to incorporate the Amended Answer upon which this contention of error is based, but they have failed to afford us any evidence which will show the materiality or relevancy of this pleading with respect to the time frame these allegations of susceptibility to undue influence are related. Appellants contend that the Certificate of Deposit and the signature card on the joint Savings Account which were the subject of litigation in the companion case, were dated in 1970, shortly after the Doctor's death. The respondents, on the other hand, argue that these incidents occurred sometime in 1973. Who is correct we are unable to determine from this record on appeal.[4]

With the record in this state we find that we are unable to afford a meaningful review to this Point and must, therefore, hold that this Point cannot be employed to reverse the judgment of the trial court.

The final sub-point of Point I of appellants' "Points Relied On" is that the trial court erred in not permitting the introduction into evidence of two warranty deeds and in precluding cross examination of Martin Sheets, Jr., regarding these two deeds.

The first of these deeds was one dated June 16, 1971, wherein Edith transferred title to an apartment building on DeMun and Northwood Avenues in Clayton, St. Louis County, Missouri, to herself, Mary Ann Sheets or Martin E. Sheets as joint tenants with a right of survivorship and not as tenants in common.

Respondents' counsel objected to the introduction of this deed into evidence on the ground that there was then pending a lawsuit in another division of the St. Louis County Circuit Court seeking to set aside this deed and that the appellants were the plaintiffs in that proceeding. He further objected that this transaction had nothing

---

**3.** In the *Estate of Sheets v. Sheets*, 558 S.W.2d 291 (Mo.App.1977).

**4.** In *Estate of Sheets v. Sheets*, 558 S.W.2d l.c. 292 the court states: "The certificate of deposit was issued . . . on February 6, 1974, . . . to Edith Sheets and Jo Anne Griffin, as joint tenants with right of survivorship. The pass-book savings account, . . . . was established as an individual account by Edith Sheets and then changed to a joint account on September 19, 1973, in the names of Edith Sheets and Carolyn Kittleson, as joint tenants with right of survivorship."

to do with whether Martin was Edith's attorney at the time of the execution of her will because this deed was executed subsequent to that occurrence.

The second warranty deed appellants sought to introduce into evidence was a warranty deed wherein the St. Mark's Presbyterian Church was the grantor and whereby Edith's residence in Claymont, St. Louis County, Missouri, was transferred to Edith and Daniel Sheets, Martin's son, as joint tenants with a right of survivorship and not as tenants in common. This deed was dated October 31, 1972.

Respondents' objection to this document was that it too was the subject of the previously mentioned pending lawsuit and that it was immaterial and irrelevant to the state of mind of the testatrix at the time she executed the will being contested.

In response, appellants' counsel stated that the purpose of offering these deeds was to show that the undue influence Martin had exercised over Edith in the procuring of the will being contested, carried through from the date shortly after the death of Doctor Sheets all the way to the time when these deeds were executed.

In each instance the trial court, in ruling on the objection, instructed the appellants' counsel that it would permit him to inquire whether the witness—Martin Sheets, Jr.—attended the closing in any representative capacity, the names of the grantors and the grantees, and the property conveyed by the deeds. He was, however, further advised, that because these deeds were the subject of another lawsuit, the documents themselves would not be received into evidence.

Appellants' counsel proceeded to adduce from Martin that he had prepared and typed the warranty deed whereby the apartment property was transferred by Edith to herself, his wife and himself as joint tenants with a right of survivorship. He also developed that Martin was present, at Edith's request, when the deed from the Church to his son and Edith which transferred title to Edith's residence to them as joint tenants with a right of survivorship, was executed. According to Martin, he was there to see that Edith "got a good, clean title."

We conclude that if the purpose for introducing these deeds into evidence was, as appellants stated to the trial court, to show "a clear case of continuing undue influence up to the time of her death," that purpose was achieved by the questions directed to Martin and the answers given, and exclusion of the deeds was, at worst, harmless error, and affords us no basis for the reversal of this judgment, and we so hold.

Judgment affirmed.

GUNN, P. J., and WEIER, J., concur.